399 P.2d 664

**GRAVER TANK & MANUFACTURING COMPANY, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona and Billy D. Tucker, Respondents.**

No. 8286.

Supreme Court of Arizona.

In Division.

March 3, 1965.

Rehearing Denied March 31, 1965.

Twitty, Sievwright & Mills, by John F. Mills, Phoenix, for petitioner.

Ira Schneier, Tucson, for respondent Billy D. Tucker.

Richard J. Daniels, Phoenix, for respondents Industrial Commission.

UDALL, Justice.

The petitioner, Graver Tank & Manufacturing Company (a self insurer under the Workmen's Compensation Act), herein referred to as employer, is before this Court on a writ of certiorari to review an award of the Industrial Commission to Billy Tucker, herein referred to as employee.

On July 3, 1962, employee was injured. as a result of an accident at a missile site near Nogales, Arizona while working for employer. Employee was first taken to a Nogales hospital. Later he was placed under the care of Dr. Juan Fonseca, a Tucson neurosurgeon, and was removed to a Tucson hospital on July 11, 1962. Dr. Fonseca stated employee had considerable limitation of motion of the neck and a questionable dislocation of his cervical spine. The X-rays confirmed straightening of the normal curvature of the neck, which is usually presumed to be evidence of muscle spasm. Medication was given to relieve pain and spasm. A neck traction was used and therapy consisting of heat and massage was administered. He was given Demoral, a pain killer, Meprobamate, a muscle relaxant and tranquilizer, with the Demoral later being changed to morphine. He was also given Sparine, a tranquilizer, in addition to a sleeping sedative.

Employee was 33 years of age at the time of the accident and had been married 11 years. The record indicates employee was a cheerful person prior to the accident and a steady worker. He did not indulge in al-

coholic beverages to any degree. After the accident his wife visited him, at the hospital in Nogales, every day. He was in great pain and constantly quarrelsome, unlike his former self. His niece visited him twice a day while he was in the hospital in Nogales. Employee had always been talkative to her, but since the accident was "real quiet" and "things just didn't seem to please him like they used to."

The hospital records reveal that on July 19, 1962 at 12:15 a. m., employee jumped out of bed

"holding onto occipital area of head. Eyes wide open with wild expression, but did not seem to become fully conscious. Returned to bed voluntarily and quietly."

Prior to his admission to the Tucson hospital, employee was supposed to be an out-patient of Dr. Fonseca. On his first visit to Dr. Fonseca, July 11, 1962, he became angry and belligerent. His pain was so severe that Dr. Fonseca had him admitted to St. Joseph's Hospital in Tucson.

During his time in the Tucson hospital the records show a pattern of severe morning headache complaints with the patient getting a "shot" presumably of Sparine and later a small dose of morphine. In the afternoon he was given Numorphan for pain. The complaints were charted at least twice during the day. On July 20, 1962, the complaints were more frequent, every three or four hours. He was given more Numorphan and morphine. He was continued on drug medication for pain until his discharge on July 23, 1962. At his discharge employee was given additional drugs for home administration to control the pain.

After arriving home after his discharge from the hospital, employee complained that his head was hurting and he took off his cervical collar. Toward evening, on the same day, July 23rd, he started getting "aggravated" at his wife, and kept saying "can't you give me anything else that will ease the pain?" Employee complained to his wife that the medicine was not helping him and that he would take a drink to see if it would help ease the pain. He consumed about four or five ounces of Bourbon whiskey around 9:00 or 10:00 p. m. After that employee quieted down for a short time. His wife testified that she could not sleep that night since employee was constantly complaining of pain. At five in the morning on July 24, he became abusive toward her and later more violent and attempted to strike her, which he had never done before. After she returned from taking his niece to a neighbor he told her to get out of the trailer and leave him alone.

Employee's wife then took the loaded gun (which was kept in the trailer for her protection when her husband was away on remote construction jobs) and put it in her purse because she was afraid her husband

would get it. Since he was very abusive she sat outside the trailer. When he came out she started walking down the road. He then got in his truck and tried to run over her. He then stopped, got out and started to run after her. She dropped her purse, which he picked up as he went back to the trailer.

She returned to the trailer with a Sheriff's deputy and picked up some clothes and her purse from which the gun was missing. Employee refused to answer any questions about the gun. His wife later returned to the trailer with his niece and he still was very abusive so she decided to take his niece and go to a motel. The next morning, July 25 at 7 a. m., she put his niece on the bus for Phoenix. A sheriff's deputy at the bus station informed her that her husband had shot himself.

The consensus of expert medical opinion was that the original injury was a producing cause of the self-inflicted gunshot wound.

The final decision of the Commission found, *inter alia,* as follows:

"1. That applicant sustained personal injury by accident arising out of and in the course of his employment on July 3, 1962.

\* \* \* \* \* \*

"5. That the applicant had an average monthly wage of $1,000.00 at the time of said accident.

"6. That the self inflicted injury of July 25, 1963 was directly related and causally connected with the accident and injury of July 3, 1962.

"7. That the applicant's condition is still disabling and the applicant is in need of further medical treatments."

Employer contends first that the gunshot wound is not compensable under the Arizona Compensation Law and second that Commission erred in finding the average monthly wage of employee was $1,000 at the time of his injury.

 The sole question before this Court is the sufficiency of the evidence to sustain the findings of the Commission. When deciding this issue, this Court does not weigh the evidence, but considers it in the light most favorable for sustaining the award. Snyder v. Industrial Commission, 96 Ariz. 81, 392 P.2d 34 (1964); McGill v. Industrial Commission, 82 Ariz. 36, 307 P.2d 1042 (1957). The findings of the Commission, if supported by sufficient competent evidence, will not be disturbed. Snyder v. Industrial Commission, supra; Savich v. Industrial Commission, 39 Ariz. 266, 5 P.2d 779 (1931).

 Employer first contends that the presumption against self injury was not overcome. We disagree. Employee admitted to examining doctors that he shot himself. A neurosurgeon with experience in gunshot wounds testified the point of

entry of the bullet was classical evidence of a self-inflicted wound. Also, the sheriff's office closed the case. We feel there is sufficient evidence in the record to sustain the finding of the commission that the gunshot wound was self-inflicted.

Next the employer contends that the wound was *purposely* self-inflicted falling within the exclusion of A.R.S. § 23–1021 (1956) which excludes compensation if an injury was purposely self-inflicted. Many courts throughout the country have been faced with this problem and a majority of them have relied on the test laid down in In re Sponatski, 220 Mass. 526, 108 N.E. 466, L.R.A.1916A, 333 (1915). See 1 Larson's Workmen's Compensation Law § 36.20 (1952). Although we feel that the medical evidence would sustain an award for the gunshot wound in this case if the Sponatski test were applied, we feel that this test leaves much to be desired. The Sponatski test would deny coverage unless the suicide or attempted suicide occurs "through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce the death." This test practically excludes from compensation those cases not marked by some violent or eccentric method of self-destruction. Larson, supra, § 36.20, has said:

"Armed with this [Sponatski] formula, courts have plunged into the murky depths of every conceivable kind of broken and anguished mind, and have come up with the cases neatly classified as compensable or not, according to whether the employee killed himself through a voluntary (though insane) choice or through a delirious impulse. The compensable cases are frequently marked by some violent or eccentric method of self-destruction, while the noncompensable cases usually present a story of quiet but ultimately unbearable agony leading to a solitary and undramatic suicide."

As pointed out by employer in their brief such a test would make most male suicides occurring after an industrial injury compensable, whereas the majority of female suicides would not be compensable since as expert testimony indicated in this case, males are more prone to choose a violent method of suicide such as shooting or hanging whereas females more likely would choose sleeping pills or some less forceful method.

The Sponatski test has also been vigorously criticized for its failure to recognize the role which pain or despair may play in breaking down a rational mental process. See e. g., Harper v. Industrial Commission, 24 Ill.2d 103, 180 N.E.2d 480 (1962) and authorities cited therein and Larson, supra § 36.30. We believe the better rule to be that where the original work-connected injuries suffered by the employee

result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, such as severe pain and despair, the self-inflicted injury cannot be considered "purposeful" within the meaning and intent of the Workmen's Compensation Act. Whitehead v. Keene Roofing Co., 43 So.2d 464 (Fla.1949). We are not persuaded by the argument that the act of suicide or attempted suicide is an independent intervening cause of the death or injury of the workman, thus breaking the chain of causation from the original injury to the death or self-inflicted injury of the workmen. We agree with the statement in Whitehead which states:

> "(w)hile it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an *act* intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a *cause* intervening between the injury and death." 43 So.2d at 465.

See also Harper v. Industrial Commission, supra; Barber v. Industrial Commission, 241 Wis. 462, 6 N.W.2d 199, 143 A.L.R. 1222 (1942) (Fowler dissent); Larson, supra, § 36.30.

■ In the case at bar employee was suffering from constant and severe pain and depression as a result of the original injury. The medical testimony clearly showed that he was deprived of his normal judgment. In fact the consensus of medical opinion was to the effect that the original injury and its direct effects upon the employee was a producing cause leading to the act of attempted suicide. See Murray v. Industrial Commission, 87 Ariz. 190, 349 P.2d 627 (1960). We therefore hold that there was sufficient evidence upon which the Commission based their finding that the self-inflicted injury of July 25 was directly related and causally connected with the accident and injury of July 3, 1962.

The employer's other major contention involved the commission's finding that at the time of his injury the employee's average monthly wage was $1,000.

The evidence indicates that during the last six and one-half months, employee earned about $7800. During his five months with employer he earned over $6400. During 17 of his 22 weeks with employer he worked overtime. Because of some unemployment, employee's earnings for the one year preceding the accident were about $8700. Employer contends that the commission in determining the average monthly wage should have used employee's earnings over the entire year. They also contend the commission erred in consider-

ing his overtime because of the unusual nature of the circumstances.

A.R.S. § 23–1041 (1963) provides that the compensation shall be fixed "on the basis of such employee's average monthly wage at the time of injury." The section defines the term monthly wage as "the average wage paid during and over the month in which the employee is killed or injured." In addition, this Court has said both normal and overtime wages must be taken into account. Field v. Industrial Commission, 73 Ariz. 133, 238 P.2d 953 (1951).

■ The Commission in compliance with the above rules found employee's average monthly wage to be $1,000.[1] The evidence shows that for over six months preceding the injury employee earned on the average of $1200 a month. We feel there is sufficient evidence to support the Commission's finding.

Employer also argues that the overtime was unusual and that the job was about to end when employee was injured. However there is evidence in the record to support the fact that employment in employee's work as an iron worker at missile sites had developed into an industry and that there were numerous missile construction sites all over the United States.[2] In addition evidence indicated that because of the nature of missile site construction, overtime is not an unusual characteristic of such work.

We therefore find that the Commission acted upon sufficient evidence in making their findings with respect to the gunshot wound and the average monthly wage of employee.

Award affirmed.

LOCKWOOD, C. J., and BERNSTEIN, J., concur.

1. A.R.S. § 23–1041 (E) (1963) provides: "[n]otwithstanding any other provision of this chapter, in computing the average monthly wage there shall be excluded from such computation all amounts of wages or other compensation for services in excess of one thousand dollars per month."

2. See Pacey v. Industrial Commission, 93 Ariz. 1, 377 P.2d 1015 (1963).