414 P.2d 179

**TUCSON RAPID TRANSIT CO., Inc., an Arizona corporation, Appellant,**

v.

**Vincent R. TOCCI and Anne M. Tocci, husband and wife, Appellees.**

**No. 2 CA–CIV 140.**

Court of Appeals of Arizona.
May 17, 1966.

Rehearing Denied June 28, 1966.
Review Denied Sept. 22, 1966.

Holesapple, Conner, Jones, McFall & Johnson, by G. Marshall Jones, Tucson, for appellant.

Hirsch, Van Slyke, Richter & Ollason, by Clague A. Van Slyke, Tucson, for appellees.

MOLLOY, Judge.

This is an appeal from a jury verdict awarding the appellees, plaintiffs below, $10,000 for injuries resulting from a collision between a transit bus belonging to the appellant, Tucson Rapid Transit Company, and an automobile being driven by the plaintiff, Anne Tocci.

On July 17, 1962, Mrs. Tocci was stopped in a lane of traffic behind other cars stopped for a red light at a street intersection in the City of Tucson, Arizona. The defendant's bus, approaching the intersection in the same direction as Mrs. Tocci's car, collided with the rear-end of the Tocci car. Mrs. Tocci was tossed about in the collision and struck her head on the sun visor of her car. Following the collision, Mrs. Tocci was examined at the military hospital at Davis Monthan Air Force Base. No broken bones or other physical injury needing medical attention were found. She was given a sedative and told to go home to rest.

After the accident, Mrs. Tocci became emotionally depressed. On August 16, 1962 she reported at the Base Hospital complaining of a severe depression. She was hospitalized over a weekend but upon being

released, on August 18, 1962, Mrs. Tocci consumed a large dose of phenobarbital capsules in an attempt to take her life. Hospitalization, and considerable psychiatric care were required following the suicide attempt. In the trial of this action, the testimony revolved largely around the emotional illness of Mrs. Tocci and the contention of the plaintiffs that the suicide attempt was a proximate result of the accident of July 17, 1962.

At the conclusion of the trial, the defendant requested an instruction to the jury to the effect that no amount should be awarded for injuries sustained as the result of the voluntary attempt on the part of Mrs. Tocci to take her own life. This instruction was refused by the trial court and this is one of the principal questions raised on appeal.

The evidence presented by the plaintiffs showed that Mrs. Tocci's childhood was emotionally deprived, her mother and father delegating her rearing to an aunt. She has never had any contact with her father and never saw her mother between the time she was one and a half years of age until approximately her sixteenth birthday. She married at twenty-one years of age. After her marriage, her husband went into the military service as a public relations officer for the Air Force. After serving in various air force bases in this country, Lt. Tocci was transferred to an air force base in Japan, where his wife and family joined him. During the course of the marriage and prior to the accident in question there were six children born to the marriage. In Japan, there were several servants to help with household tasks and a Japanese girl was employed to direct the household operations. While in Japan, Mrs. Tocci was hospitalized three times for anxiety or depressive reactions. The last of these hospitalizations, on November 10, 1958, was the result of a suicide gesture or attempt by Mrs. Tocci, in the form of the taking of an overdose of phenobarbital. In August of 1959, Lt. Tocci was transferred to the Air Force Base at Tucson, Arizona. Sometime later, the Japanese girl who had been in charge

of the household in Japan joined the Tocci family, not as an employee, but as a friend to live in the home. Mrs. Tocci attended the University of Arizona on a part-time basis, taking classes in accounting. This was the situation at the time of the accident on July 17, 1962.

After the accident Mrs. Tocci began to feel deeply depressed. The primary cause of her depression, as described by Mrs. Tocci, was the fact that the Japanese girl took over the management of the home while she was convalescing, and the Japanese girl was able to perform the normal household tasks so efficiently that Mrs. Tocci began to feel "useless." The following quotation from the record illustrates her testimony in this regard:

"Q Did you get better or did you get worse as time went on?

"A The aches and pains got better, but I started feeling worse and worse inside myself, in my—you can call it heart, you can call it the head, whatever you want to, but I was feeling worse.

"Q Day by day?

"A The more that I saw Caisson [the nickname used by the Toccis for the Japanese girl] performing my job so efficiently, so well, when I would see her directing the children, children need direction, and she would tell them what to do, they would do it without argument. I would tell them, oh, sometimes they'd do it, but —in fact they always ended up doing it, but usually I had to reach the stage where I'm hollering, then I got results. She was doing this job well, and seemingly without—without strain, without effort, and here is a job that I should be doing.

"I never did it well, but I should be doing it, and here she is doing it so—

\*     \*     \*     \*     \*     \*

"Q Did you have any inclination or did you not have inclination that this was coming?

"A I had an inclination. The more useless—pardon me. The more that I saw Caisson doing my job so well, the more

useless I felt. It was obvious, I mean nobody saw me. The bus company didn't see me, but nobody saw me. I was obviously unnecessary, I had—shall we say it was a—it hurt my self respect, is that okay? The word is felt, I felt like I'm not needed, I should—how smoothly the house runs without me."

The plaintiff testified as to her attempt at suicide of August 18 as follows:

"A * * * I went home and I had in my possession a large bottle of phenobarbital that had been prescribed for a different ailment, for a physical ailment, and I went home, I figured that was my last chance for help.

"I mean I had gone and I had gotten the week-end of rest and calm and peace and actual help, that's what I had been doing at home, resting. So I went home and the children were outside, my husband left. He picked me up, brought me home and he left for the University, he had classes to teach, he had a job to do.

"Caisson was home with the children, the children were outside playing, those that were at the walking stage, they were outside playing and we were friendly, I say we, I mean Caisson and myself, we were friendly with our next door neighbors, and customarily either they would come to our house for coffee in the morning or we would go to their house.

"It was—that's the way housewives operate, I guess, I don't know. But Caisson went next door for a coffee break, she already had the house looking just fine, she went next door for a coffee break and that was my chance. I went in the kitchen where the pills were and got them down off the shelf and I don't know if I took the whole bottle or not, but the exact dosage, I knew at the time, I was able to— to know at the time what I was taking, but I knew that I was taking sufficient to kill myself."

In October of 1962, the plaintiff was rehospitalized for a few days because of a resurgence of suicidal ideation which was related to the fact that Caisson left the Tocci home.

A psychiatrist treated the plaintiff for emotional illness over the course of approximately six months after the depressive reaction of August 16, during which time he held between forty and forty-five conferences with the patient. This psychiatrist testified at the trial that in his opinion the automobile accident of July 17 was the "precipitating factor" of the suicide attempt in August. He testified that Mrs. Tocci had an emotional instability related to feelings of being unwanted and inadequate. That her deprived childhood was a substantial factor in causing her to be a dependent person and that the succession of children which she had borne created stresses which intensified her feelings of inadequacy. He further testified that Mrs. Tocci was married to an ambitious, capable person, of high standards of attainment for himself and for those associated with him and that he tended to engender in his wife a feeling that she was not matching up to expectations. In 1954 the aunt who had reared Mrs. Tocci died and this was an important factor, according to the psychiatrist, in bringing about the depressive reactions of his patient. With this background, the doctor testified that the accident of July 17 caused a "fracture of the ego" which he likened to the fracture of a leg which wasn't able to mend.

To a question on an insurance form questionnaire of "In your opinion, is disability a result of above described accident solely?", this doctor answered: "No, her psychiatric symptoms antedated the accident. The accident was merely an additional stress."

The diagnosis of this treating psychiatrist was supported by a written report, admitted in evidence, of a psychiatrist employed by the defendant. He diagnosed the accident of July 1962 as a "precipitating factor" of the suicidal attempt.

In support of their contention that under this evidence there was a jury question as to whether the suicide attempt of August was a proximate result of the rear-end col-

lision of the month before, the plaintiffs rely upon the case law of four workmen's compensation cases and one tort case. The workmen's compensation cases are: Graver Tank & Mfg. Co. v. Industrial Commission, 97 Ariz. 256, 399 P.2d 664 (1965); Harper v. Industrial Commission, 24 Ill.2d 103, 180 N.E.2d 480 (1962); Burnight v. Industrial Commission, 181 Cal.App.2d 816, 5 Cal.Rptr. 786 (1960); and Whitehead v. Keene Roofing Co., 43 So.2d 464 (Fla.1949). The tort case is Tate v. Canonica, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960).

These cases are said to be exemplary of a present day "trend" to discard the "irresistible impulse" test in favor of a more "enlightened approach."

This court is satisfied that if the decision of the trial court allowing damages for this suicidal attempt is to be sustained, it must be on the basis of a rather dramatic shift in the case law of this country occurring in the last decade. As of 1950, the following seemed to be the state of the pertinent law:

"As a general rule a person will not be relieved of liability by an intervening force which could reasonably have been foreseen, nor by one which is a normal incident of the risk created. However, if such intervening force takes the form of suicide the practically unanimous rule is that such act is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide." 11 A.L.R.2d 751, 757 (1950)

If there has been a recent assault upon this body of law, we do not believe that workmen's compensation cases can be considered anything more than an indirect attack. This is so because of the fundamental difference in the nature of liability between a negligence action and a claim under a workmen's compensation statute. In a negligence action, liability is imposed because of fault, at least in part a moral concept. Negligence liability is predicated upon a recognizable or foreseeable risk of harm. Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 101, 59 A.L.R. 1253 (1928); Tucker v. Collar, 79 Ariz. 141, 146–147, 285 P.2d 178 (1955).

The Restatement (Second), Torts phrases this concept:

"e. The hazard problem. Conduct is negligent because it tends to subject the interests of another to an unreasonable risk of harm. Such a risk may be made up of a number of different hazards, which frequently are of a more or less definite character. The actor's negligence lies in subjecting the other to the aggregate of such hazards. In other words, the duty established by law to refrain from the negligent conduct is established in order to protect the other from the risk of having his interest invaded by harm resulting from one or more of this limited number of hazards."

"f. Harm beyond the risk. Where the harm which in fact results is caused by the intervention of factors or forces which form no part of the recognizable risk involved in the actor's conduct, the actor is ordinarily not liable. This is subject, however, to the qualification that where the harm which has resulted was itself within the risk created, the fact that it has been brought about in a manner which was not to be expected, or by the intervention of forces which were not within the risk, does not necessarily prevent the actor's liability. (See § 442 B.)" Restatement (Second), Torts § 281, pp. 6–7 (1965)

The problem of superseding cause is handled in the Restatement (Second), Torts in Ch. 16 under the heading "The Causal Relation Necessary to Responsibility for Negligence" (§§ 430–462 inclusive). However, the Restatement recognizes that the problem is really not one of causation, but rather one of duty:

"h. Relation to legal cause. The problem which is involved in determining whether a particular intervening force is or is not a superseding cause of the harm is in reality a problem of determining whether the intervention of the force was

within the scope of the reasons imposing the duty upon the actor to refrain from negligent conduct. If the duty is designed, in part at least, to protect the other from the hazard of being harmed by the intervening force, or by the effect of the intervening force operating on the condition created by the negligent conduct, then that hazard is within the duty, and the intervening force is not a superseding cause. (See §§ 443–452.) A completely accurate analysis of the hazard element in negligence would require the material on superseding cause in Chapter 16 to be placed in this chapter. However, in the past the courts generally have discussed the effect of intervening forces in terms of causation. *The solution of the problem of determining whether the presence of an intervening force should relieve the actor from liability for harm which his conduct was a substantial factor in bringing about (see § 440) is facilitated by an appreciation of the fact that the problem is a 'hazard problem' rather than a problem of causation."* (Emphasis added)

Restatement (Second), Torts § 281, p. 8 (1965)

Section 430 of the Restatement (Second), Torts, p. 426, which is the introductory section to Ch. 16 of this work, reiterates the interrelationship of these concepts.

With this in mind it is very apparent that the particular section of the Restatement (Second), Torts, dealing with suicide, contained in Ch. 16, does not necessarily apply to a workmen's compensation case. Liability under workmen's compensation law is imposed independent of negligence. There the "hazard problem" is completely immaterial. A rule of legal causation rightfully governing a workmen's compensation case may very well fail to provide a just rule in a negligence case. An Illinois appellate court has expressed this distinction as follows:

"Appellees rely upon Harper v. Industrial Commission, 24 Ill.2d 103, 107, 180 N.E.2d 480 (1962), a workman's com-

pensation case which allowed recovery for a death benefit where a compensable industrial injury was followed by a suicide. We do not believe that this case is in point because the doctrine of proximate cause has no relation to the workmen's compensation cases and the public policy is entirely different."

Stasiof v. Chicago Hoist & Body Co., 50 Ill.App.2d 115, 200 N.E.2d 88 (1964)

We now quote the pertinent section of the Restatement (Second), Torts § 455 (1965), which this court should follow unless there be cogent reason to do otherwise, Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74 (1965):

"§ 455. Acts Done During Insanity Caused by Negligent Conduct

"If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

"(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

"(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason."

"Comment:

"*a.* The situation to which this Section is most frequently applicable is that in which another whom the defendant's negligence has made insane does some act which results in his own death. It is also applicable when the other's acts inflict less serious harm upon him."

"Comment on Clause (a):" [Omitted because Clause (a), supra, is deemed to be obviously inapplicable to this case]

"Comment on Clause (b):

"*c.* This Clause applies where the other's insanity does not deprive him of his capacity to realize the nature or consequence of his act or from forming a

purpose to kill or cause harm to himself and selecting means appropriate to accomplish his purpose, but his act is done under an insane impulse which is irresistible because his insanity has prevented his reason from controlling his actions. It, therefore, includes acts done under insane delusions if they are sufficiently strong to preclude resistance by such reason as his insanity leaves to the person laboring under them."

"Illustration:

"3. A negligently injuries B. The injuries cause insanity which takes the form of suicidal mania. While suffering in this condition, B locks his door to prevent interference and cuts his throat with a knife which he has secreted and sharpened for that purpose. A's negligence is the legal cause of B's death or other harm resulting from his cutting his throat."

"Comment:

"d. On the other hand, the fact that the actor's negligence causes harm to another which subjects him to recurrent attacks of extreme melancholia does not make the actor liable for death or other harm which the other deliberately inflicts upon himself during a lucid interval in an effort to terminate his life because of his dread of the increasingly frequent recurrence of these attacks."
Restatement (Second), Torts § 455, pp. 493–94 (1965)

We believe a quotation from William L. Prosser, who is the official reporter of the Restatement of the Law of Torts (Second), to be helpful in understanding the succinct Restatement language:

"Some difficulty has arisen in cases where the injured person becomes insane and commits suicide. Although there are cases to the contrary, it is the prevailing view that when his insanity prevents him from realizing the nature of his act or controlling his conduct, the suicide is to be regarded as a direct result, and no intervening force at all, or else as a normal incident of the consequences inflicted, for which the defendant will be liable. The situation is the same as if he should hurt himself during unconsciousness or delirium brought on by the injury. But if the man is sane, or if the suicide is during a lucid interval, when he is in full command of his faculties, but his life has become unendurable to him by reason of his injuries it is agreed in negligence cases that his voluntary choice is an abnormal thing, which supersedes the defendant's liability."
Prosser, Torts § 51, p. 320 (3d ed. 1964)

■ It is most apparent in this case that the suicide attempt of the defendant did not occur during a rage, a frenzy or a delirium. The question presents itself as to whether there was substantial evidence that the accident was a substantial factor in bringing about an "insanity" which caused an impulse which was "impossible" to resist. We find no such evidence.

■ The word "insanity" has no definite legal meaning.[1] Since the year 1951, the

---

1. Black's Law Dictionary, p. 929 (4th ed. 1951), gives the following definition of "insanity":
   "Unsoundness of mind; madness; mental alienation or derangement; a morbid psychic condition resulting from disorder of the brain, whether arising from malformation or defective organization or morbid processes affecting the brain primarily or diseased states of the general system implicating it secondarily, which involved the intellect, the emotions, the will, and the moral sense, or some of these faculties, and which is characterized especially by their non-development, derangement, or perversion, and is manifested, in most forms, by delusions, incapacity to reason or to judge, or by uncontrollable impulses. In law, such a want of reason, memory, and intelligence as prevents a man from comprehending the nature and consequences of his acts or from distinguishing between right and wrong conduct. (citation)
   " 'Insanity' does not include certain states of transitory mental disorder, such as trances, epilepsy, hysteria, and delirium."

word has had very little place in our civil law.[2] In this state, "mentally ill persons"[3] are committed to a "state hospital for the mentally ill."[4] If the word "insanity" as used in the Restatement is to be equated with the concept of "mental illness" under our law, then the mental illness with which we are concerned here is substantially caused by factors antedating the collision of July 17, 1962. And even if the mental illness could be said to have been caused by the accident, we are left without any substantial evidence that the suicide attempt was a result of an irresistible impulse.

Looking at the matter from the standpoint of foreseeability and fault, it seems beyond all reason to say that the defendant's bus driver should have foreseen that his act in striking the rear-end of the plaintiffs' car would cause a deliberate suicide attempt. Such a possibility is not one of the risks that made the defendant's conduct negligent. We recognize that in drawing a limit as to liability, based on the concept of superseding cause, courts are making a policy decision, Prosser, Proximate Cause in California, 38 Calif.L.Rev. 369, 398 (1950). We believe this policy decision is based on principles of inherent justice and sound public policy.

While we do not believe that workmen's compensation cases are controlling, in all such cases cited by the plaintiffs to support their judgment we have found substantial evidence, lacking in this case, that the accident in question caused an unbroken chain of events which directly resulted in the suicide attempt.

In Graver Tank & Mfg. Co. v. Industrial Commission, 97 Ariz. 256, 399 P.2d 664 (1965), for instance, there was evidence other than merely an accident being a "precipitating factor" of a suicide. The rule laid down by the Graver case is stated by our Supreme Court as follows:

"We believe the better rule to be that where the original work-connected in-

juries suffered by the employee result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, such as severe pain and despair, the self-inflicted injury cannot be considered 'purposeful' within the meaning and intent of the Workmen's Compensation Act."

97 Ariz. at 260–261, 399 P.2d at 668.

The facts giving rise to this rule are stated, in part, as follows:

"In the case at bar employee was suffering from constant and severe pain and depression as a result of the original injury. The medical testimony clearly showed that he was deprived of his normal judgment. In fact the consensus of medical opinion was to the effect that the original injury and its direct effects upon the employee was a producing cause leading to the act of attempted suicide."

97 Ariz. at 261, 399 P.2d at 668.

As to tort cases, our research has disclosed no case, sounding in negligence, which has completely cast aside the concept of foreseeability. Tate v. Canonica, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960), the only tort case relied upon by the plaintiffs, is a case dealing with two counts, the first dealing with an intentional tort and the second with a cause of action in negligence. As to the first count, the court holds that an unforeseeable intervening cause is no defense, because of the intentional nature of the tort, relying upon the Restatement (Second), Torts §§ 306 and 312. However, when the court deals with the count in negligence, the court adopts a rule that is more "liberal" than the rule of the Restatement, but still one retaining the requirement of irresistibility of the impulse:

"* * * where the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the

---

2. Ch. 14 Laws of 1951.

3. A.R.S. § 36–501 et seq., as amended by Ch. 84 Laws of 1958.

4. A.R.S. § 36–202 as amended by Ch. 66 Laws of 1959.

act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death. Some cases speak of 'insanity,' and of 'delirium or frenzy,' and take the view that if the decedent knew what he was doing, the suicide is an independent intervening cause. We think, in the light of modern knowledge as to mental illness, that this view is too narrow. It should not make any difference that the decedent 'knew what he was doing'. If defendant is to avoid liability, the decedent's act must be voluntary, not in that sense but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself."

Tate v. Canonica, 5 Cal.Rptr. at 40

The only authority cited by the plaintiffs which appears to be "liberal" enough to encompass the plaintiffs' case is an article in 30 NACCA L.J., p. 162, et seq., which contends that modern psychiatry establishes: "There is virtually no free choice of death, no true deliberation between life and death." (30 NACCA L.J. at 170.) According to this article, the "irresistible impulse test is but a half-way house" and the law of the future is one imposing only a "test of 'substantial factors' or 'chain-of-events.'" In this journal article both Tate v. Canonica and the decision of Orcutt v. Spokane County, 58 Wash.2d 846, 364 P.2d 1102 (1961), are acclaimed as being progressive steps forward in the case law.

We have examined Orcutt v. Spokane County and we find nothing that goes much beyond the Restatement rule. In the language of the Washington Supreme Court a suicide may be a proximate result of a negligent injury " '* * * when the act causing the death is the result of an uncontrollable impulse resulting from a mental condition caused by the injuries. * * ' " (364 P.2d at 1103.)

There are recent decisions which stay even closer to the traditional view than the Restatement: Lancaster v. Montesi, 390 S.W.2d 217 (Tenn.1965); Stasiof v. Chicago Hoist & Body Co., 50 Ill.App.2d 115, 200 N.E.2d 88 (1964); Wallace v. Bounds, 369 S.W.2d 138 (Mo.1963); Bogust v. Iverson, 102 N.W.2d 228 (Wis. 1960).

There being no evidence to support plaintiffs' contention that the suicide attempt was the proximate result of defendant's negligence, we hold that the requested instruction limiting damages should have been given.

Other assignments of error will now be considered to the extent that they present problems pertinent to a retrial.

■ The appellant argues that reversible error was committed by the trial court in giving an instruction based upon A.R.S. § 28–952, subsec. A, par. 1, a motor vehicle statute requiring that all motor vehicles shall be equipped with adequate brakes. It is the defendant's contention that the complaint speaks only of negligent "operation" of the bus on the occasion in question, and that A.R.S. § 28–952, subsec. A, par. 1, lays down a rule pertaining to the *equipping* and *maintenance* of a vehicle and not to its "operation." We find no merit in this contention. The pretrial order on which this case was tried determined that the issues to be tried were:

"(1) Was the accident an unavoidable accident?

"(2) Was the defendant negligent, and if so, was such negligence a proximate cause of the accident?"

We have held that a pretrial order governs the subsequent course of litigation. Loya v. Fong, 1 Ariz.App. 482, 404 P.2d 826 (1965). Though the subject pretrial order is far from what is conceived by this court to be an exemplary one, nevertheless, it clearly frames the issues in

broader terms than the complaint. There is no showing that the defendant objected in any way to the order, or requested any further limitation of the issues. Considering this pretrial order and the fact that a rear-end collision case was being tried, it is difficult to conceive that the defendant was under the misapprehension that the question of proper brakes was not in issue. Accordingly, there being evidence in the record to support the instruction in question, Dayton v. Palmer, 1 Ariz.App. 184, 400 P.2d 855 (1965), we find no error in the giving of the instruction simply because the complaint did not allege negligent maintenance of brakes.

■ Appellant contends further that the trial court erred in refusing to instruct the jury on the law regarding "unavoidable accident." Since the trial of this case, it has been definitely established by our Supreme Court that "* * * it is always error to give an instruction on unavoidable accident * * *." City of Phoenix v. Camfield, 97 Ariz. 316, 324, 400 P.2d 115, 121 (1965).

Appellant also complains of failure to give a "sudden emergency"[5] instruction. Among the instructions given the jury were:

"Negligence may arise from doing an act, or from failing to act. Thus, negligence is defined as the doing of an

act which a reasonably prudent or careful person would not do, or the failure to do something which a reasonably prudent or careful person would do *under the same or similar circumstances.*

\* \* \* \* \* \*

"Further, the fact that a party might have avoided an accident by some conduct other than that used is not sufficient, considered alone, to prove that he was negligent. Different individuals, all exercising ordinary care, might behave differently under the same circumstances." (Emphasis added)

■ These instructions were coupled with other instructions defining negligence and informing the jury that the plaintiffs had the burden of proof as to this issue. Together, these instructions clearly gave authority for a defendant's argument to the jury, in rebuttal to the plaintiffs' argument that the bus driver should have applied his emergency brakes a little sooner after he learned of the brake failure, that ordinary persons under these particular circumstances of emergency might not have reacted any sooner and that, under the instructions of the court, the failure to act sooner was not negligence. We fail to see that any prejudice resulted to the defendant from the court's declining to give the sudden emergency instruction and pursuant to our constitutional mandate,[6] we

---

5. The requested instruction, defendant's requested instruction No. 11, was:

"You are instructed that 'A person who, without negligence on his part, is suddenly and unexpectedly confronted with peril arising from either the actual presence or the appearance of imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments. His duty is to exercise only the care that an ordinarily prudent person would exercise in the same situation. If at that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might

have been followed by any ordinarily prudent person under the same conditions he does all the law requires of him, although in the light of afterevents, it should appear that a different course would have been better and safer.'"

6. Arizona Constitution, Art. 6, § 27, A.R.S.:
"§ 27. Charge to juries; reversal of causes for technical error
"Section 27. Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law. No cause shall be reversed for technical error in pleadings or proceedings when upon the whole case it shall appear that substantial justice has been done. Added, election Nov. 8, 1960."

hold that no reversible error was committed in this regard.

The other contentions of error involve the giving of instructions on damages and the amount of the verdict, which is contended to be excessive. These contentions appear to be well taken, in view of the ruling herein made that the suicide attempt could not be held to be the proximate result of the rear-end collision. The only evidence of medical expense and of future incapacity were as to injuries resulting from the self-inflicted injury.

■ But, though the verdict may be excessive if the damage caused by the self-inflicted injury is eliminated, the appellant admitted at time of oral argument that the amount of the verdict was within reasonable limits if the suicide attempt were included as damage. We agree. Hence, there is no showing that the verdict was the result of passion and prejudice on the part of the jury, which would, if such had existed, have contaminated the finding of the jury on the liability issue. Mayo v. Ephrom, 84 Ariz. 169, 325 P.2d 814 (1958). The only prejudicial errors found affect the issue of damages which is an issue severable from that of liability. Hirsh v. Manley, 81 Ariz. 94, 104, 300 P.2d 588, 595 (1956); Rule 59(h) Rules of Civil Procedure, 16 A.R.S. Under the facts of this case, we believe that justice will be served by limiting a retrial to the issue of damages. Accordingly, we remand the case for a new trial on the issue of damages with the issue of whether the suicide attempt was a proximate result of the accident in question being resolved in favor of the defendant.

Remanded for a new trial on the issue of damages only.

KRUCKER, C. J., and HATHAWAY, J., concur.