**Elizabeth Lillian CURTIS et al.**

v.

**STATE of Rhode Island DEPARTMENT FOR CHILDREN AND THEIR FAMILIES et al.**

**No. 85–136–Appeal.**

Supreme Court of Rhode Island.

March 13, 1987.

Joseph E. Marran, Jr., Pawtucket, for plaintiffs.

Kenneth P. Borden, Higgins Cavanagh & Cooney, Laureen Q. D'Ambra, Dept. for Children & Their Families, Thomas D. Gidley, Gidley, Lovegreen & Sarli, Judith Crowell, John F. Dolan, Rice, Dolan & Kershaw, Richard A. Boren, Lipsey & Skolnik, Providence, for defendants.

## OPINION

FAY, Chief Justice.

This Superior Court action for false imprisonment, assault and battery, and intentional infliction of emotional distress arose out of the three-day hospitalization of a suspected victim of child abuse under G.L. 1956 (1977 Reenactment) chapter 11 of title 40.[1] The plaintiffs are the child, Elizabeth Curtis, and her parents, Wilson Curtis, Jr., and Theresa Curtis. The defendants are the State of Rhode Island Department for Children and Their Families (DCF); Mary Rice, social worker for the Coventry School System; Edward Kenaghan, protective worker for DCF; Kent County Memorial Hospital; Dr. Graham Newstead, a staff physician at Kent County Hospital; and the School Committee for the Town of Coventry, and its members individually.[2]

At the close of plaintiffs' case the trial justice granted defendants a directed verdict on all counts, from which plaintiffs now appeal. We affirm.

The evidence presented by plaintiffs revealed the following: In 1978 Elizabeth, aged ten, was a student in the special education program at the Hopkins Hill School in the town of Coventry. On December 15 of that year, Elizabeth acted up in the classroom, throwing books, desks, and chairs around the room, requiring restraint by her teacher, Mrs. Nye. Elizabeth had a history of such disruptive behavior, dating back to when she started school in Johnston. Shortly after the family moved to Coventry, Elizabeth was assigned to the care of defendant Rice, who had been in contact with Elizabeth's teachers on several occasions following incidents of such behavior.

On the day of the incident in question Rice responded to a call from one of Elizabeth's teachers to the effect that Elizabeth was complaining of having been beaten by her father the night before. When Rice arrived at the school, Elizabeth's teachers

1. A count of slander, originally included in this action, was dismissed as regards all defendants and is not a part of this appeal.

2. At the time of this incident, the agency now known as the Department for Children and Their Families was called Child Welfare Services and operated as an agency under the Department of Social and Rehabilitative Services. Their functions are identical, and DCF does not dispute its responsibility for the actions of its predecessor. However, there is no allegation that the liability of either DCF, Kent County Hospital, or the Coventry School Committee is other than vicarious. Hence our findings regarding the liability of their respective staff members will determine the liability of the defendant organizations.

confirmed this report, indicating in addition that Elizabeth had a bruise on her arm and leg, had made suicidal gestures by tying a shoelace around her neck and attempting to staple her wrists, and was afraid to go home. They told Rice that when Elizabeth had gone to the store with her parents the evening before, something had broken in the car for which she was blamed and her father had become very angry, saying "he would kill her." Elizabeth had complained of beatings during the week and a half prior to the incident, but no bruises had been noticed on her body, nor had she displayed the fear of going home that she did at this time.

Convinced that there were valid reasons to report this incident to the state, Rice called DCF. The report was relayed to defendant Kenaghan, who was also familiar with Elizabeth and her family, having investigated a previous report in 1977 of possible child abuse, found to be without basis. Upon receiving the current report, the crux of which was that Elizabeth had injuries that she stated were caused by her father, Kenaghan proceeded to the school. He asked Elizabeth directly where she got the injuries, and she stated that her father had hit her. Having found in his earlier investigation that Elizabeth had lied about her father's beating her, Kenaghan specifically asked her if she was lying now and she answered, "No." Kenaghan saw the bruise on Elizabeth's arm, a black-and-blue mark about an inch long, but did not see the bruise on her leg.

Kenaghan and Rice took Elizabeth to the emergency room at Kent County Hospital. Elizabeth was first examined by Dr. Hurt, an emergency-room physician. The emergency service record signed by Dr. Hurt contained the following history:

"Coventry School Dept. Social Worker states: ?? LUMP ON RIGHT SIDE OF FOREHEAD, ? BRUISE TO RIGHT UPPER LEG (OUTSIDE). Social Worker states ? CHILD ABUSE."

Doctor Hurt's examination revealed a tender area on Elizabeth's right temple, with minimum swelling, a one-centimeter-square ecchymotic tender area on her right forearm, and a two-by-five-centimeter-square ecchymosis on her right thigh.[3] He recorded his diagnosis as "multiple blunt trauma." Doctor Hurt also filled out a form entitled "Physicians Report of Battered and/or Abused Child," describing the extent of Elizabeth's injuries as contusions to her right forearm, right temple, and right thigh.

As an emergency-room physician, Dr. Hurt did not have admitting privileges. He called Dr. Graham Newstead, a staff physician at the hospital, and told him "that he had a patient in the emergency room, a young girl who had bruises upon her body * * * that the child had stated to him that these injuries or bruises had been caused by her father, and that her admission to the hospital was being requested by [DCF]." According to Dr. Newstead, "Dr. Hurt * * * had some suspicion in his mind as to whether or not the child had been abused, and he recommended admission of the child, which I agreed to." Elizabeth was admitted at 5:06 p.m.

Upon his arrival at the hospital to examine Elizabeth, Dr. Newstead was informed by attending nurses that she had told them that her father had hit her, a fact that is corroborated by the nurses' record for that date. Doctor Newstead found Elizabeth's injuries to be minor—in themselves, "in the absence of other information," insufficient to label her a battered child.

Elizabeth remained in the hospital for three days and received no medical treatment while she was there. She was discharged to the custody of her parents on December 18, 1978 at 3:40 p.m.

At trial, Elizabeth, then fifteen years old, could not remember telling her teacher, Rice, or Kenaghan that her father had beaten her. However, she did not deny having done so. Neither did she specifically deny giving such information to Dr. Hurt. Although she initially denied telling the nurses that her father had hit her, she

---

3. "Ecchymosis" is defined as "[a] purplish patch caused by extravasation of blood into the skin." Stedman's Medical Dictionary, 439 (5th ed. 1982).

later changed her testimony. Elizabeth's parents both denied that any beating had taken place.

Before Elizabeth was admitted, Kenaghan called Elizabeth's home to tell her parents what had happened and to request their consent to her examination, which Mrs. Curtis refused. The Curtises then drove to the hospital. When Mrs. Curtis entered the hospital, two Warwick policemen and a hospital guard were at the door. She at first testified that she was pushed against the door and searched thoroughly by all of them. On cross-examination, however, she stated that only the Warwick police were involved. While Mr. Curtis was in his car in the parking lot of the hospital, he was approached by two police officers with their guns drawn, was searched, and was asked some questions. It is unclear from the record how the police got there; it seems that someone from the hospital called them, in reaction to a threat Mrs. Curtis had allegedly made to Rice when Rice visited the Curtis home the day before.

At the close of plaintiffs' evidence, all defendants moved for directed verdicts on all counts, which the trial justice granted. The plaintiffs contend that the trial justice erred, arguing that factual issues remained to be determined by the jury.

Our duty in reviewing the grant of a motion for a directed verdict is the same as that of the trial justice in the first instance. We must examine the evidence and the reasonable inferences therefrom in the light most favorable to the nonmoving party, without considering the weight of the evidence or the credibility of the witnesses. If we find no issue upon which reasonable persons could differ, the motion must be granted. *Moody v. McElroy*, 513 A.2d 5, 7 (R.I.1986). Our review of the evidence in this case, weighted appropriately in favor of plaintiffs, persuades us that a reasonable juror could not find defendants liable for false imprisonment, assault and battery, or intentional infliction of emotional distress.

"[T]he essence of an action for false imprisonment is the restraint of another without legal justification." *Webbier v. Thoroughbred Racing Protective Bureau, Inc.*, 105 R.I. 605, 613, 254 A.2d 285, 290 (1969). We find the actions of defendants in this case to have been legally justified under chapter 11 of title 40. In fact, the actions of defendants Rice and Kenaghan were not only legally justified but legally mandated.

According to § 40–11–3,

"[a]ny person who has reasonable cause to know or suspect that any child has been abused or neglected * * * shall, within twenty-four (24) hours, transfer such information to the director of social and rehabilitative services or his agent * * *."

Section 40–11–2(2) defines an abused and/or neglected child, inter alia, as one whose

"physical or mental health or welfare is harmed or threatened with harm when his parent or other person responsible for his welfare:

(a) inflicts, or allows to be inflicted upon the child physical or mental injury, including excessive corporal punishment; or

(b) creates or allows to be created a substantial risk of physical or mental injury to the child * * *."

According to § 40–11–2(3), " '[m]ental injury' includes a state of substantially diminished psychological or intellectual functioning in relation to * * * such factors as * * * control of aggressive or self-destructive impulses; acting-out or misbehavior, including incorrigibility, ungovernability * * *."

■ There is no question that Mary Rice had reasonable cause to suspect that Elizabeth had been abused. Elizabeth's statement that her father had beaten her and threatened to kill her, reported by teachers with whom Rice had had repeated contact in conjunction with her treatment of Elizabeth and whose veracity she had no reason to doubt, Elizabeth's complaints during the preceding week and a half of similar beatings, the reported bruises on her body, her unusual fear of going home, and her violently disruptive and self-abusive behavior

were more than sufficient to mandate a report to DCF under § 40-11-3.

■ When DCF receives a report from a source other than a physician alleging that a child has been abused, DCF must "cause the report to be investigated immediately," § 40-11-3, and "have the child examined by a licensed physician," § 40-11-6(3). Once he received Rice's report, defendant Kenaghan acted in accordance with his statutory duty by going to the school, speaking with Elizabeth, and taking her to the hospital for an examination after she told him that her father had caused her injuries.

■ The actions of the hospital and the physicians involved were similarly justified. Section 40-11-5 provides that

"[a]ny physician treating a child who has suffered physical injury that appears to have been caused by other than accidental means * * * shall have the right to keep such child in the custody of a hospital for no longer than seventy-two (72) hours, with or without the consent of such child's parents or guardian * * *."

Doctor Hurt's recommendation—carried out by Dr. Newstead—that Elizabeth be admitted to the hospital was justified under § 40-11-5, given the injuries that his examination revealed, Elizabeth's statement to him that her father had hit her, and the history he was given when she was brought to the emergency room. That Elizabeth's injuries were minor is of no consequence. Any physical injury apparently caused by other than accidental means is sufficient under § 40-11-5. Although Elizabeth's injuries were perhaps insufficient on their own to justify a finding of abuse, as was acknowledged by Dr. Newstead, there was sufficient "other information" to indicate that they were of suspicious origin.

Since defendants' conduct was justified under the statute, an action for false imprisonment could not lie. Thus, the trial justice appropriately granted defendants a directed verdict on this count.

■ The plaintiffs' claim that defendants' detention of Elizabeth constituted as-

sault and battery was, according to plaintiffs' brief, premised upon its alleged illegality. Since we find Elizabeth's detention to have been legally justified, direction of a verdict against plaintiffs on this account was also appropriate.

The plaintiffs also brought a claim of assault and battery against defendants for the conduct of the Warwick police against Wilson and Theresa Curtis, premised upon defendants' alleged joint responsibility for the presence of the police at the hospital. Although, as noted earlier, it is unclear from the record how or why the police came to the hospital, it is clear that even if defendants were responsible for calling them, they were not necessarily liable for the police officers' subsequent behavior.

In *Powers v. Carvalho*, 117 R.I. 519, 368 A.2d 1242 (1977), we addressed the question of a private citizen's liability in an action for false imprisonment in which the arrest and detention were effectuated by the police because of information supplied by the citizen. Quoting Prosser, *Torts* § 11 at 47 (4th ed. 1971) with favor, we noted that

"in order to find liability for the instigator of an unlawful arrest, 'the defendant must have taken some active part in bringing about the unlawful arrest itself, by some "affirmative direction, persuasion, request or voluntary participation." There is no liability for merely giving information to legal authorities, who are left entirely free to use their own judgment * * *.'" 117 R.I. at 528-29, 368 A.2d at 1248.

We accordingly held that the "good-faith * * * informant who simply reports his or her version of the facts to the police * * * is not liable in an action for false arrest * * *." *Id.* at 529, 368 A.2d at 1248.

■ The same holds true by analogy with regard to an informant's liability in an action for assault and battery by the police. There is no evidence of "direction, persuasion, request, or participation" on the part of defendants in this case in the actions of the Warwick police alleged by plaintiffs to constitute assault and battery. Nor is there any evidence of bad faith on the part

of those defendants who allegedly provided the information that brought the police to the hospital. As such, the action against them for assault and battery on this basis could not be maintained, and the trial justice properly directed a verdict in their favor.

Finally, plaintiffs brought a count of intentional infliction of emotional distress against defendants for their alleged restriction of personal contact and communication between Elizabeth and her parents. In *Bedard v. Notre Dame Hospital*, 89 R.I. 195, 151 A.2d 690 (1959), a mother sued the hospital for the mental anguish she suffered as a result of the allegedly unlawful detention of her infant son by the hospital. This court held that mental anguish could not be considered an element of damages in the absence of allegations that it was accompanied by physical ills. *Id.* at 198–99, 151 A.2d at 692. *See also Simone v. Rhode Island Co.*, 28 R.I. 186, 66 A. 202 (1907). *Cf. D'Ambra v. United States*, 114 R.I. 643, 657–58, 338 A.2d 524, 531 (1975) (nonnegligent mother, outside zone of danger, who looked on while infant child was fatally struck by negligently operated truck, could recover damages in an action for negligent infliction of emotional distress for "mental and emotional harm accompanied by physical symptoms").

Furthermore, more recently, in cases involving a creditor-debtor relationship, *Champlin v. Washington Trust Co. of Westerly*, 478 A.2d 985, 989 (R.I.1984), and a supervisor-employee relationship, *Elias v. Youngken*, 493 A.2d 158, 163–64 (R.I.1985), we held that a claim of intentional infliction of emotional distress also requires a showing of " 'extreme and outrageous' " conduct on the part of the defendant. In *Champlin* we noted that "a creditor will not be held liable when he has done no more than insist on his legal rights in a permissible way, even though such insistence is likely or even certain to * * * [cause the debtor] * * * to suffer some

emotional distress." 478 A.2d at 989. Where the question is not only one of legal right but one of legal duty, the rationale in *Champlin* applies with even greater force. There is no question that defendants' fulfillment of their statutory responsibility here was bound to cause plaintiffs emotional stress. However, absent evidence of extreme and outrageous conduct on their part in the fulfillment of that responsibility, an action for intentional infliction of emotional distress will not lie.

 The plaintiffs neither alleged nor presented evidence of physical ills suffered as a result of Elizabeth's detention, nor did they present any evidence of conduct on the part of the defendants that could be considered extreme or outrageous. The grant of a directed verdict on this count was accordingly proper.[4]

For the reasons stated, therefore, the plaintiffs' appeal is denied and dismissed, the judgment of the Superior Court is affirmed, and the papers in the case are remanded to Superior Court.

---

4. We are aware that G.L.1956 (1977 Reenactment) § 40–11–4 provides immunity from civil or criminal liability to any person who participates in good faith in making a report pursuant to the chapter. As the precise scope of that immunity has not yet been determined by this court, we elected to consider the merits of the underlying causes of action, which we found clearly not proved.