Judith A. CLIFT et al.

v.

NARRAGANSETT TELEVISION L.P.

No. 94–594–Appeal.

Supreme Court of Rhode Island.

Dec. 23, 1996.

Ira L. Schreiber, Cranston, for Plaintiffs.

Joseph V. Cavanagh, Jr., Providence, for Defendant.

## OPINION

BOURCIER, Justice.

This case comes before us on appeal from a final judgment of the Superior Court following summary judgment in favor of Narragansett Television, L.P.

## I

### Facts and Travel

On the morning of May 17, 1993, a tragic series of events began to unfold. Early that morning, from his home in Chepachet in the town of Glocester, Bruce E. Clift (decedent) telephoned his wife, Judith A. Clift (Clift), who was at work to tell her that "it's over" and that he was going to commit suicide.

It appears that it was known that her husband was a mentally ill person, and so Clift left her workplace and returned home, which was to a small single family house on Route 44 in the town of Glocester. When she arrived, she saw her husband perched in an upstairs window. He had turned on a gas jet inside the house, intending thereby to carry out his previously announced intention to commit suicide. He was at that time also firing guns which he kept in the house. Clift tried unsuccessfully to convince her husband to put down his guns and to stop his self-destructive behavior and threats of suicide, but to no avail. Ignoring his wife's requests, he continued his threats of suicide and, in an apparent attempt to convince his wife of the sincerity of his threats, he then proceeded to cut his throat with a shard of glass from a broken window, causing blood to gush out. At that point, a police vehicle drove up to the house, causing him to become especially irate, whereupon he again began firing his weapons into the shrubbery surrounding the house as well as into the house ceilings. His wife, in fear, immediately exited the house and waited outside for further police assistance to arrive.

Within a short time thereafter, the Chepachet Police and the State Police surrounded the house and cordoned it off, setting up a police barrier. A State Police officer trained to deal with hostage situations was summoned to the scene, and he telephoned the decedent in an attempt to dissuade him from committing suicide. During the sensitive negotiation period that followed, an exponentially growing press contingency began to gather at the scene but was kept back from the house by the police barrier. Hours later, shortly after 5 p.m., an enterprising reporter from Narragansett Television, L.P. (Narragansett), doing business here in Rhode Island through its local television station, Channel 12, telephoned the Clift home. She did so without first having informed the police or the Clift family of her intentions, and she spoke to the decedent, who then agreed to a recorded telephone interview. The reporter told the decedent that the taped interview would be played later, sometime during the 6 p.m. television station news broadcast. At 6:04 p.m. the reporter, while still at the scene, appeared on the 6 p.m. news telecast and reported from the scene that,

> "it's obvious we're dealing with a very troubled man right now. When I spoke to Bruce Clift on the telephone he sounded very disoriented. I asked him if he wanted us to broadcast a message for him. He agreed. What you're about to hear is a man who is angry at the world and could be on the verge of suicide. It's an interview you'll see only on Channel 12."

The telephone colloquy reported after that introduction was as follows:

> "REPORTER: If your wife is watching right now, what would you say to your wife so she would understand?
>
> "DECEDENT: Only that I love her, that anything she has done* * * I apologize 'cause I know it's my fault. Hey, you know, the whole nine yards, right. This is suicide.
>
> "REPORTER: Do you realize what is going on outside your house?
>
> "DECEDENT: Yeah, I know everything.
>
> "REPORTER: And what do you think about this?
>
> "DECEDENT: I really don't care what's going on outside my house.
>
> "REPORTER: Are you scared?

"DECEDENT: I don't give a [beep inserted by Channel 12] if the National Guard comes out here.

"REPORTER: Did you mean to hold your wife hostage? Did you.

* * *

"DECEDENT: No, I don't want my wife hostage.

"REPORTER: Did you want to harm her in any way?

"DECEDENT: No.

"REPORTER: Did you harm her in any way?

"DECEDENT: No.

"REPORTER: Are you sick? Do you have some kind of sickness?

"DECEDENT: No, I don't want no help no more. I'm done trying to play help.

"REPORTER: Are you going to give yourself up sir and try to work.

"DECEDENT: No, I'm not giving myself up anywhere. This is it. This is the final stand.

"REPORTER: Mr. Clift told me he would not surrender, and after he made that very clear to me, he hung up the 'phone.'"

The decedent carried out his previous suicide threats at approximately 6:07 p.m. The police immediately entered the Clift home, and noted that the television sets in the home were operating and were tuned to Channel 12, the channel that had just previously broadcast the exclusive report of the reporter's telephone call to the decedent.

On February 14, 1994, Clift, as administratrix of her husband's estate; for herself, as a surviving widow; and as surviving parent of decedent's three minor children, commenced a civil action against the defendant, Narragansett. In her complaint, as finally amended on March 1, 1994, she alleged nine causes of action, which were designated therein as "negligence," "wilful, wanton misconduct," "intentional tort of trespass," "right of privacy," "negligent infliction of emotional distress," "intentional infliction of emotional dis-

tress," "violation of wrongful death statutes," "loss of consortium," and "loss of companionship."

Narragansett responded to Clift's complaint by motion to dismiss pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, asserting therein a failure to state a claim upon which relief could be granted. Clift's objection and response to that motion was supported by the affidavit of Stanley Cath, M.D. (Dr. Cath), a Massachusetts psychoanalyst retained for purposes of litigation by Clift. Narragansett's motion was then, because of that affidavit, treated by the hearing justice as a motion for summary judgment.[1] After hearing thereon, the hearing justice rendered a written decision on September 21, 1994 in which she granted Narragansett's motion. On September 29, 1994, final judgment was entered dismissing Clift's complaint. This appeal followed.

## II

### Negligence

■ Blackstone describes suicide as

"Self–Murder, the pretended heroism, but real cowardice, of the stoic philosophers, who destroyed themselves to avoid those ills which they had not the fortitude to endure, though the attempting it seems to be countenanced by the civil law, yet was punished by the Athenian law * * *. And also the law of England wisely and religiously considers, that no man hath a power to destroy life, but by commission from God, the author of it: and, as the suicide is guilty of a double offense; one spiritual, in invading the prerogative of the Almighty, and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects; the law has therefore ranked this among the highest crimes, making it a peculiar species of felony, a felony committed on one's self. * * * The law very rationally judges, that every melancholy or hypochondriac fit does not deprive a man of the capacity of

---

1. Although the affidavit only addresses the effect of the telephone call on the decedent's mental and emotional state, the complaint refers to the effect of both the telephone call and the eventual broadcast of that call.

discerning right from wrong; which is necessary, as was observed in a former chapter, to form a legal excuse. And therefore if a real lunatic kills himself in a lucid interval, he is a felo de se as much as another man." *Tate v. Canonica,* 180 Cal. App.2d 898, 5 Cal.Rptr. 28, 31–32 (1960) (quoting 4 Blackstone, *Commentaries on the Laws of England,* ch. 14 at 189 (8th ed. 1778)).

Rhode Island, a common law state, also considers suicide a felony. *In re Marlene B.,* 540 A.2d 1028 (R.I.1988).

The first civil action cases in this country involving suicide claims allegedly resulting from a defendant's negligent act were strongly influenced by the common law classification of suicide as a felony. As a result, the courts in those earlier cases found that the act of suicide normally terminated all civil liability of a defendant. The judicial reasoning was that suicide, being a criminal act, was typically not the foreseeable result of any alleged negligence. *See Scheffer v. Railroad Co.,* 105 U.S. (15 Otto) 249, 26 L.Ed. 1070 (1881). From this early restricted view there emerged, however, a line of cases that came to recognize a right of recovery in certain limited factual instances.

The new rule that developed in those cases was that the act of suicide could permit a civil action for damages but only if the particular suicide was the

"result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the * * * [defendant's negligent act], and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act. An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues." *Bogust v. Iverson,* 10 Wis.2d 129, 102 N.W.2d 228, 232 (1960)(quoting *Daniels v. New York N.H. & H.R. R.,* 183 Mass. 393, 67 N.E. 424 (1903)).

*See also Brown v. American Steel and Wire Co.,* 43 Ind.App. 560, 88 N.E. 80 (1909); *Freyermuth v. Lutfy,* 376 Mass. 612, 382 N.E.2d 1059 (1978); *Cauverien v. De Metz,* 20 Misc.2d 144, 188 N.Y.S.2d 627 (N.Y.Sup. 1959); *Falkenstein v. City of Bismarck,* 268 N.W.2d 787 (N.D.1978). The *Daniels* rule relied upon in *Bogust* later emerged in the Restatement (Second) *Torts,* § 455 (1965) which states:

"If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason."

The right to civil recovery for negligent conduct allegedly resulting in suicide was considered, and some contend further expanded,[2] by the California court in 1960.

In *Tate,* 5 Cal.Rptr. at 40, perhaps the most cited case on the issue, that court held that

"where the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death."

The California court additionally noted that there could be liability even if the deceased knew what he was doing, that is, when he knew the nature of his act, but did not have the ability to decide against the suicide and to refrain from killing himself. *Id.* That California rule is essentially the

---

**2.** *See Tucson Rapid Transit Co. v. Tocci,* 3 Ariz. App. 330, 414 P.2d 179, 186 (1966)("the [*Tate*] court adopts a rule that is more 'liberal' than the rule of the Restatement").

same as the view adopted by the majority of other courts that have been confronted with the civil-liability-for-suicide issue. It permits recovery when a deceased knew and was aware of the nature of his or her act but was unable to completely abandon or overcome the "uncontrollable impulse" to carry it out. *See Tucson Rapid Transit Co. v. Tocci,* 3 Ariz.App. 330, 414 P.2d 179, 186–87 (1966).[3] The reasoning of *Tate* has been followed in many of the later decisions. *See Exxon Corp. v. Brecheen,* 526 S.W.2d 519, 524 (Tex.1975)(interpreting uncontrollable impulse rule as applying in situations in which the deceased had knowledge of the nature of his suicidal act but was unable to control his actions); *Orcutt v. Spokane County,* 58 Wash.2d 846, 364 P.2d 1102, 1105 (1961)(where medical test establishes uncontrollable impulse to commit suicide, it is of no consequence that the deceased knew the nature of the act or used reasoning to accomplish the act). *See also Jamison v. Storer Broadcasting Co.,* 511 F.Supp. 1286 (E.D.Mich., S.D.1981).

Although the holding in *Tate* did not extend beyond the well-established uncontrollable impulse rule, the court did, however, proceed to question, in dicta, whether in cases involving a voluntary suicide not committed under the influence of an uncontrollable impulse " 'the intervening act of a third person * * * relieve[s] the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing.' " *Tate,* 5 Cal.Rptr. at 42. However, the California court specifically stated that they "need not and do not now decide" that question. *Id.*

The closest any court has yet come to adopting the broad view suggested by the dicta in *Tate* was *Zygmaniak v. Kawasaki Motors Corp.,* 131 N.J.Super. 403, 330 A.2d 56 (1974), *dismissed,* 68 N.J. 94, 343 A.2d 97 (1975), in which the New Jersey court reversed a grant of summary judgment in favor of the defendant. That court in that case held that a finding of an irresistible impulse to commit suicide was unnecessary so long as the other necessary elements of the plaintiff's negligence claim were satisfied. Because that case centered upon an appeal from a summary judgment grant, the court, in sustaining the appeal, did not undertake to discuss the merits of the case but only determined that the case pleadings and affidavits considered by the hearing justice raised a question of fact that should have prevented summary judgment. No later negligence case in New Jersey has followed that precedent, and no other state has adopted such a liberal right of recovery in suicide cases. Some later cases have, however, indicated a willingness to adopt such a rule but, as in *Tate,* have only expressed that willingness in dicta. *See Halko v. New Jersey Transit Rail Operations, Inc.,* 677 F.Supp. 135 (S.D.N.Y. 1987); *Fuller v. Preis,* 35 N.Y.2d 425, 363 N.Y.S.2d 568, 322 N.E.2d 263 (1974). *Cf. Pigney v. Pointer's Transport Services, Ltd.,* 1 W.L.R. 1121 (1957)(an English case allowing recovery for a suicide without a preliminary showing of an uncontrollable impulse, insanity, or delirium).

It is important to note that to this point in our opinion we have only addressed those cases concerning claims based solely upon common law negligence principles and not cases that involved intentional acts or conduct by a civil defendant that were intended to bring about the final act of suicide. That distinction between the negligent action of a defendant and the intentional action of a defendant is significant because in those intentionally caused suicide cases, an entirely different rule of liability comes into play. We are also not herein addressing case-fact instances wherein a special relationship existed between a defendant and a suicide-deceased in a civil action later commenced by representatives of the deceased. In those particular cases, the courts, because of the special relationship factor, have uniformly noted the existence of a duty of ordinary care. In such cases, a defendant could be held liable for the suicide, notwithstanding the absence of any uncontrollable impulse, if

---

**3.** It is not clear why the *Tucson* court felt *Tate* expanded the rule set forth in the Restatement (Second) *Torts* § 455 (1965) since the Restatement permits recovery if the deceased's mental state prevented realization of the nature of his act *or* if the deceased's mental state prevented him from overcoming his irresistible impulse to commit suicide.

the suicide was a foreseeable risk stemming from the defendant's negligent acts. *See Hickey v. Zezulka*, 439 Mich. 408, 487 N.W.2d 106, 119 (1992) (prisoner in a holding cell hanged himself and court held that the defendant owed a duty of ordinary care to give aid to and protect the prisoner from harm because of the special relationship that existed between jailer and his prisoner and the prisoner's claim brought by his legal representatives was premised upon the theory that the defendant was negligent in failing to prevent his prisoner's suicide or in creating a stimulus for the commission of his suicidal act, and the suicide was not a superseding intervening cause of his injury); *Falkenstein v. City of Bismarck*, 268 N.W.2d 787, 791 (N.D.1978)(inmate of city jail committed suicide and court held that "notice of propensity to commit suicide would result in an obligation to exercise greater care in preventing the suicide"). *See also Meier v. Ross General Hospital*, 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519 (1968)(a hospital was potentially liable because a hospital patient who was at a high risk for suicide was placed near an open window from which she later jumped).

With regard to civil claims alleging, as a basis for liability, the negligence of a defendant as being the proximate cause of a decedent's suicide, the majority rule that has evolved is that unless a special relationship existed between the defendant and the deceased that created an increased or higher duty of care to protect a potentially suicidal person from foreseeable injury, the Restatement (Second) *Torts* § 455 (1965) rule is the most favored and applied.[4] That rule recognizes liability for negligent conduct (1) that brings about delirium or insanity in another and (2) if while that condition of delirium or insanity continues to exist, it prevents the affected person from realizing the nature of his or her condition *or* makes it impossible for him or her to resist the suicidal impulse by depriving that person of the capacity to reasonably control his or her conduct and not carry out the suicidal impulse.

We believe that the application of the uncontrollable impulse rule is especially compelling in regard to the facts present in this appeal because in addition to the negligence liability issue, there is interwoven into those facts fundamental First Amendment considerations.

In *DeFilippo v. National Broadcasting Co.*, 446 A.2d 1036 (R.I.1982), we there held that a television station was not liable for the hanging death of a child allegedly inspired by the showing of a stunt on the "Tonight Show" similar to the one used by the child to hang himself. After establishing that the First Amendment applies to the states through the Fourteenth Amendment, we began our legal analysis in that case with a discussion of the extent to which First Amendment rights may be proscribed. We found that only speech falling into certain specifically defined areas could be controlled. Those controllable areas included obscenity, fighting words, defamatory invasions of privacy, and words likely to produce imminent lawless action (incitement). In *DeFilippo* we considered the program-stunt-descriptive-speech leading to the hanging suicide to be incitement speech. *Id.* at 1040. Although potentially subject to regulation, we nonetheless held that the speech displayed on the "Tonight Show" did not permit recovery under either a negligence or a recklessness theory because

> "the incitement exception must be applied with extreme care since the criteria underlying its application are vague. Further, allowing recovery under such an exception would inevitably lead to self-censorship on the part of broadcasters, thus depriving both broadcasters and viewers of freedom

---

4. In the workers' compensation field, liability for a decedent's suicide has been found when " 'the incontrovertible evidence shows that, without the injury, there would have been no suicide.' " *Graver Tank & Manufacturing. Co. v. Industrial Commission*, 97 Ariz. 256, 399 P.2d 664, 668 (1965); *Burnight v. Industrial Accident Commission*, 181 Cal.App.2d 816, 5 Cal.Rptr. 786, 793 (1960). That rule is essentially a "but-for" rule, a significantly more liberal rule than that set forth in *Bogust, Falkenstein, Tate,* and the Restatement (Second) *Torts,* § 455 (1965). However, the workers' compensation analysis has not been embraced by any court outside the workers' compensation field because the fault concept, so central in negligence cases, is absent and not essential in such cases. *See Tucson Rapid Transit Co., supra.* (rejecting the analysis in workers' compensation cases and adopting instead the irresistible impulse rule).

and choice, for 'above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content.' " *Id.* at 1042 (citing *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972)).

As has been previously noted, courts generally have refused to expand the right of recovery for a suicide alleged to have been negligently caused beyond the uncontrollable impulse rule explained in *Bogust* and *Tate*. That right of recovery certainly should not be expanded in fact situations when fundamental First Amendment rights of the press are involved, as they are in this case and appeal.

"[T]he right to publish is central to the First Amendment and basic to the existence of constitutional democracy. * * * No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut-off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised." *Branzburg v. Hayes*, 408 U.S. 665, 727–28, 92 S.Ct. 2646, 2672–73, 33 L.Ed.2d 626, 667 (1972)(Stewart, J., dissenting).

Although the press " 'has no special immunity from the application of general laws,' " *id.* at 683, 92 S.Ct. at 2657, 33 L.Ed.2d at 640, we certainly should not adopt, where fundamental rights of the press are involved, a broader rule than that followed in the overwhelming majority of other state jurisdictions. For us to do so would subject the members of the Rhode Island press, as well as the citizenry of Rhode Island, to greater civil liability than other press persons and citizens in the majority of our sister states. Such a rule would impermissibly inhibit the Rhode Island press in its efforts to gather and disseminate the news. We believe that the uncontrollable impulse rule, which is generally applied in negligence cases involving suicide in which the press is not involved, should also be the rule in cases in which the press is involved. Any rule expanding liability in cases involving the press, such as suggested in *Tate, Halko, Fuller,* and *Zygman-*

*iak,* would in our view unfairly create a dual standard of care that would actually impinge on fundamental First Amendment rights of the press.

▪ In light of scientific advances constantly being made in the study of the cause and the prevention of suicide, we conclude that even though the press is not entitled to any greater protection than that afforded by the uncontrollable impulse rule, it is likewise not deserving of anything less. That approach we believe strikes the proper balance between the right of a person to recover for a suicide allegedly caused by the negligence of the press and the constitutional requirement to protect the press from the chilling effect of overly broad regulations of speech. That is not to say that we believe the press is immune from liability for its negligence or that the First Amendment is an impenetrable shield from a negligence claim. To the contrary, we believe that notwithstanding First Amendment constitutional protections, everyone, including the press, should be answerable for unprivileged negligent actions that proximately result in suicide. We realize in expressing that belief that there are those both in and out the press-media field who insist that the First Amendment is an impenetrable shield from both press criticism and civil liability. We also realize that First Amendment rights of the press are as much endangered by its zealots as by its critics. Accordingly, the uncontrollable impulse rule that we believe to be fair to all, as explained earlier, will hereinafter be applied in Rhode Island to all negligence actions seeking recovery for suicide regardless of who a defendant might be or whether the press is involved.

▪ Applying the uncontrollable impulse rule to the facts of this appeal, we conclude that the trial justice erred in granting summary judgment on the negligence count. There were facts alleged in the medical affidavit of Dr. Cath, the plaintiffs' medical expert, that suggest that the decedent's suicide resulted from an uncontrollable impulse that was brought about by a delirium or insanity caused by Narragansett's negligence. It appears that the trial justice undertook to evaluate the opinions expressed by Dr. Cath in

his affidavit. He was not permitted to do so. That fact evaluation constituted a matter that is reserved for the trial jury. The role of the hearing justice in summary judgment proceedings is limited to issue finding and not issue determination. *Saltzman v. Atlantic Realty Co.*, 434 A.2d 1343, 1345 (1981). In this case, the trial justice was not permitted to evaluate Dr. Cath's opinions but was instead required to view them in the light most favorable to the plaintiffs, accepting as true the medical opinion that the telephone call exacerbated the already existing "self-destructive impulses" of the decedent and that absent the reporter's telephone call it was "unlikely" that the decedent would have committed suicide "when he did." That affidavit presented an issue of material fact earmarked for the trial jury to decide. *See Holliston Mills, Inc. v. Citizens Trust Co.*, 604 A.2d 331, 334 (R.I.1992); *Rustigian v. Celona*, 478 A.2d 187, 189–90 (R.I.1984); *Steinberg v. State*, 427 A.2d 338, 340 (R.I. 1981).

## III

### Wrongful Death, Loss of Consortium, Loss of Companionship

Because summary judgment was improper on the plaintiffs' negligence count, it was accordingly improper in regard to the wrongful death, loss of consortium, and loss of companionship claims and counts.

## IV

### Intentional Infliction of Emotional Distress

■ The analysis of whether a defendant is liable for a suicide allegedly caused by intentional conduct differs from the analysis of liability for negligent conduct because there is no superseding-cause concept applicable to intentional torts. *Kimberlin v. De-Long*, 637 N.E.2d 121 (Ind.1994). *See also* Victor E. Schwartz, *Civil Liability for Caus-*

*ing Suicide: A Synthesis of Law and Psychiatry*, 24 Vand.L.Rev. 217 (1971). Thus "[a] defendant who intentionally subjected another to mental distress without intending to cause bodily harm would nevertheless be liable for resulting bodily harm if he should have foreseen that the mental distress might cause such harm." *Tate*, 5 Cal.Rptr. at 34 (citing *State Rubbish Collectors Ass'n v. Siliznoff*, 38 Cal.2d 330, 240 P.2d 282 (1952)). *See also* Restatement (Second) *Torts* § 306 (1965). However, foreseeability is not, in and of itself, sufficient to establish liability in cases involving suicide. There must in addition be proof that a defendant's intentional conduct was a "substantial factor" in bringing about the suicide, certainly a more stringent test than that employed in typical intentional infliction of emotional distress cases. *Rowe v. Marder*, 750 F.Supp. 718, 724 (W.D.Pa.1990), *aff'd*, 935 F.2d 1282 (3d Cir. 1991); *Tate*, 5 Cal.Rptr. at 36; *Kimberlin*, 637 N.E.2d at 127; *Mayer v. Town of Hampton*, 127 N.H. 81, 497 A.2d 1206 (1985). The stricter substantial factor rule is inherently necessary in suicide cases because "the final cause of death always appears as an independent act of a separate will, always raising the very real possibility that the suicide was truly unrelated to the defendant's actions." *Rowe*, 750 F.Supp. at 724. Additionally, there must be proved an intent to cause injury and not just an intent to act. Thus, liability can only be found where "the actor *intended to cause injury*, and the injury is a substantial factor in bringing about the suicide." *Tate*, 5 Cal.Rptr. at 36.

■ Notwithstanding our acknowledgment of the substantial factor rule, as well as our prior adoption of Restatement (Second) *Torts*, § 46 (1965), in *Champlin v. Washington Trust Co. of Westerly*, 478 A.2d 985, 988 (R.I.1984), the instant case is not a substantial factor case, and the plaintiffs have failed to allege in their complaint the necessary elements of a claim for intentional infliction of emotional distress.[5] That failure entitled

---

**5.** A concise explanation of the required elements for an intentional infliction of severe emotional distress claim is found in *Burbridge v. Paschal*, 239 N.J.Super. 139, 570 A.2d 1250 (A.D.1990).

"Generally speaking, to establish a claim for intentional infliction of emotional distress, the

plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must

Narragansett to summary judgment. In order for the plaintiffs to have avoided summary judgment, they were required to allege in their complaint and demonstrate not only extreme and outrageous conduct on the part of Narragansett, but also the existence of resulting physical symptomatology. *Reilly v. United States,* 547 A.2d 894 (R.I.1988). Other than a general conclusory statement in the amended complaint, the plaintiffs allege. no physical ills caused by the defendant's conduct. In fact, they ignore Rhode Island's physical symptomatology requirement and cite instead in their brief to this Court a Maine case that merely requires severe *mental* pain. *Vicnire v. Ford Motor Credit Co.,* 401 A.2d 148 (Me.1979). The Maine court distinguished between negligent and intentional infliction of emotional distress claims by holding that physical symptoms are necessary only when the infliction of emotional distress is negligent. However, this Court has specifically stated that in Rhode Island no difference exists between negligent and intentional infliction of emotional distress claims in respect to the need for physical symptomatology. We have recognized "the right to recover damages by one who has been subjected to the intentional *or* the negligent infliction of mental distress as long as the distress [is] * * * *accompanied by physical ills.*" (Emphasis added.) *Reilly,* 547 A.2d at 896.

■ The unsupported conclusory assertions of physical ills contained in the plaintiffs' complaint were insufficient in our view to have successfully resisted the defendant's motion for summary judgment. "The opposing party [to a summary judgment motion] may not rest upon allegations contained in the pleadings alone to establish a genuine issue of material fact." *Sisters of Mercy v. Wilkie,* 668 A.2d 650, 652 (R.I.1996)(citing *Nichola v. John Hancock Mutual Life Insurance Co.,* 471 A.2d 945, 948 (R.I.1984)). The memoranda and briefs submitted to this Court and to the Superior Court below did not add any substantive meaning to the assertions made in the plaintiffs' complaint. It fails to state a viable claim for the intentional infliction of emotional distress. The motion justice did not err in granting summary judgment for the defendant on count 6. It was for the Court in the first instance to determine whether the defendant's alleged conduct, set out in the complaint, could reasonably be regarded as so extreme and outrageous to result in liability. Restatement (Second) *Torts* § 46, comment h (1965).

As the Court in *Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) stated:

"The 1948 Restatement expressly provided that privileged conduct could not be the basis for liability (Restatement of Torts § 46 [1948 Supp.]), and the comments to the current version signify an intent to continue the privileged-conduct exception: 'The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where [the actor] has done no more than to insist upon his [or her] legal rights in a permissible way, even though he [or she] is well aware that such insistence is certain to cause emotional distress.' (Restatement [Second] of Torts § 46, comment g.)

"A newspaper's publication of a newsworthy photograph is an act within the

---

intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.

"Second, the defendant's conduct must be extreme and outrageous. The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Fourth, the emotional distress suffered by the plaintiff must be 'so severe that no reasonable man could be expected to endure it.' By circumscribing the cause of action with an elevated threshold for liability and damages, courts have authorized legitimate claims while eliminating those that should not be compensable.

"The severity of the emotional distress raises questions of both law and fact. Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." *Id.,* 570 A.2d at 1259–60 (quoting *Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 544 A.2d 857 (1988)).

contemplation of the 'privileged-conduct' exception (*compare, Hustler Mag. v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41.[*sic*]) Thus, even if defendants were aware that publication would cause plaintiff emotional distress (*see,* Restatement [Second] of Torts § 46, comment f), publication—without more—could not ordinarily lead to liability for intentional infliction of emotional distress. We do not mean to suggest, however, that a plaintiff could never defeat the privilege and state a claim for intentional infliction of emotional distress." *Howell,* 596 N.Y.S.2d 350, 612 N.E.2d at 705.

## V

### Invasion of Privacy

An action for invasion of privacy was not maintainable at common law, *Kalian v. PACE,* 122 R.I. 429, 431, 408 A.2d 608, 609 (1979), and the only available mechanism by which such an action may be maintained is G.L.1956 § 9–1–28.1. That statute provides that

"every person in this state shall have a right to privacy which shall be defined to include any of the following rights individually:

(1) The right to be secure from unreasonable intrusion upon one's physical solitude or seclusion;

(A) In order to recover for violation of this right, it must be established that:

(i) It was an invasion of something that is entitled to be private or would be expected to be private;

(ii) Such invasion was or is offensive or objectionable to a reasonable man; although,

(B) The person who discloses such information need not benefit from such disclosure.

(2) The right to be secure from an appropriation of one's name or likeness;

* * *

(3) The right to be secure from unreasonable publicity given to one's private life;

(A) In order to recover for violation of this right, it must be established that:

(i) there has been some publication of a private fact;

(ii) The fact which has been made public must be one which would be offensive or objectionable to a reasonable man of ordinary sensibilities;

(B) The fact which has been disclosed need not be of any benefit to the discloser of such fact.

(4) The right to be secure from publicity that reasonably places another in a false light before the public."

Subsection (1) of that statute is the portion relevant to this appeal.

■ In respect to the invasion of privacy claim asserted on behalf of the decedent, we conclude that that claim is without merit since the right to privacy dies with the person. *Henry v. Cherry & Webb,* 30 R.I. 13, 73 A. 97 (1909). *See also Providence Journal Co. v. Federal Bureau of Investigation,* 460 F.Supp. 778, 793 (D.R.I.1978), *rev'd on other grounds,* 602 F.2d 1010 (1st Cir.1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980); Restatement (Second) *Torts* § 652I, comments a, b (1977).

■ As pertains to the invasion of privacy claim asserted by the Clift family, we conclude that the one telephone call by the reporter did not invade any area of the family's seclusion that could reasonably have been expected to remain private. Certainly no one can question the newsworthiness of the sad but public incident. Only one telephone call during that publicity-charged incident was made by the reporter, and that single telephone call was insufficient to sustain an invasion of privacy claim. *See Burris v. South Central Bell Telephone Co.,* 540 F.Supp. 905 (S.D.Miss.1982); *Lynn v. Allied Corp.,* 41 Ohio App.3d 392, 536 N.E.2d 25 (1987). Moreover, a telephone conversation with a reporter in which a person voluntarily participated has been held insufficient to sustain an invasion of privacy claim. *Wolf v. Regardie,* 553 A.2d 1213 (D.C.App.1989). There was nothing in the act of telephoning the decedent in this case that revealed to the public anything that would not have come to the public's attention irrespective of the telephone call. It was already public knowledge

that the decedent was threatening to commit suicide and that his wife had been inside the home earlier that fateful day attempting to dissuade the decedent from doing so. The defendant's reporter by inquiring of the decedent if he was "sick" did not improperly invade the Clift family's privacy since it was directed only to the decedent. In regard to the eventual later television broadcast report of the telephone call, it was well within the right of any news reporter to report such a newsworthy story. While perhaps lacking in good taste, the reporter's conversation with the decedent did not, however, rise to the level of an actionable intrusion into the Clift family's seclusion, and summary judgment was properly granted on the invasion of privacy claim. *See Howell, supra.;* Restatement (Second) *Torts,* § 46, comment g (1965).

Accordingly, for all the above reasons, the plaintiffs' appeal as to counts 1, 7, 8 and 9 is sustained. Their appeal as to counts 4 and 6 is denied. With respect to counts 3 and 5, plaintiffs have waived their appeal. As regards count 2, claiming willful, wanton misconduct and punitive damages, we note that because of our disposition of the plaintiffs' appeal on counts 4 and 6 and their waiver of appeal on count 3, punitive damages would be inappropriate on the counts remanded for trial. Accordingly the plaintiffs' appeal on count 2 is likewise dismissed. The judgment is, thus, affirmed in part and vacated in part.

The papers in this case are remanded to the Superior Court for further proceedings in accordance with this opinion.

FLANDERS, Justice, concurring in part and dissenting in part.

I join in all aspects of the court's opinion except for part IV, which affirms the trial court's dismissal of the intentional-infliction-of-emotional-distress claim. I respectfully dissent from part IV because, in the circumstances of this case, I do not believe proof of physical symptoms of emotional distress should be a necessary element of this cause of action. I also disagree with the court's conclusion that "the instant case is not a substantial factor case." The question of whether the defendant's alleged intentional misconduct was a substantial factor in bringing about the decedent's suicide is a factual issue that should not be determined, as it was here, on a summary-judgment motion.[6]

A majority of the courts that have addressed the physical symptoms issue allow recovery for intentional infliction of emotional distress notwithstanding the absence of any physical injuries. *See* Annotation, *Modern Status of Intentional Infliction of Mental Distress as Independent Tort; "Outrage,"* 38 A.L.R.4th 998 (1985) (collecting cases). In doing so, these jurisdictions have adopted the position of the Restatement (Second) *Torts* § 46 (1965) that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."[7]

6. Ironically, two of the cases relied on by the majority support this proposition. *See Rowe v. Marder,* 750 F.Supp. 718, 724 (W.D.Pa.1990) (suggesting that it is for the "jury" to decide whether an intentional wrong was a " 'substantial factor' in causing the suicide"), *aff'd,* 935 F.2d 1282 (3d Cir.1991); *Tate v. Canonica,* 180 Cal.App.2d 898, 5 Cal.Rptr. 28, 38 (1960) (holding that "defendants would only be liable if (a) they intentionally caused severe physical or mental distress to decedent, and (b) that physical or mental distress was severe enough to be, in the *judgment of the trier of fact,* a substantial factor in bringing about the suicide") (emphasis added). And according to Prosser and Keeton,

"if reasonable persons might differ, either because relevant facts are in dispute or because application of a legal concept (such as a 'substantial factor' formulation) is an evaluative determination as to which reasonable persons might differ, the issue is submitted to the jury

with appropriate instructions * * *." W. Page Keeton et al., *The Law of Torts* § 45 at 321 (5th ed. 1984).

*See also Mississippi v. Edgeworth,* 214 So.2d 579, 586 (Miss.1968) (when "a defendant has committed an intentional tort, questions of whether the deceased was induced to take his life by an irresistible impulse and whether the intentional tort was a substantial factor in causing the suicide are ordinarily issues for the jury").

7. One recent law review article notes that of the forty-eight states that now recognize the tort of intentional infliction of emotional distress, all but three have adopted the Restatement's articulation of the elements of this cause of action. *See* Merle H. Weiner, *Domestic Violence and the Per Se Standard of Outrage,* 54 Maryland L.Rev. 183, 197 (1995) (discussing Restatement (Second) *Torts* § 46 (1965)); *see also* Mandana Shahvari, Comment, *Afraids: Fear of Aids as a Cause of*

Indeed, in *Champlin v. Washington Trust Co., of Westerly,* 478 A.2d 985, 988 (R.I.1984), this court adopted § 46 of the Restatement (Second) *Torts* as the standard to be used in determining the liability of a creditor accused of intentionally inflicting severe emotional distress on a debtor.

To be sure, there are dicta in some of our decisions that support a physical injury requirement. *E.g., Reilly v. United States,* 547 A.2d 894 (R.I.1988); *Curtis v. State Department for Children and Their Families,* 522 A.2d 203 (R.I.1987). But in *Reilly* the court was answering a question certified to it from the United States District Court for the District of Rhode Island in a case having to do only with a *negligent*-infliction-of-emotional-distress claim. And in *Curtis* the language pertaining to the necessity for proof of physical symptoms was unnecessary to the court's holding that maintenance of an intentional-infliction-of-emotional-distress claim requires evidence of extreme outrageous conduct. Chief Justice Fay, the author of the court's opinion in *Curtis,* made this very point in his dissent in the *Reilly* case:

> "Although the *Curtis* opinion refers to older cases that required physical symptomatology of emotional injury, its holding pertains to the necessity of proving *extreme and outrageous conduct.* Such conduct *eliminates the need for a physical manifestation.*" (Emphases added.) *Reilly,* 547 A.2d at 902 (Fay, C.J., dissenting).

For the reasons stated by Chief Justice Fay dissenting with Justice Kelleher in *Reilly,* I would not set the bar so high as to require those victimized by another's outrageous misdeeds to vault a physical-injury hurdle before their foreseeable mental anguish can be compensable—at least not in intentional-tort cases like this one in which, in order for a plaintiff to recover at all, the defendant's conduct must be so outrageous "as to go beyond all bounds of decency." Restatement (Second) *Torts* § 46 cmt. d.

In such cases the presumption that some type of severe emotional distress will occur is great, and consequently there is less chance that any such claim will be disingenuous. In

any event, I would tend to resolve doubts about the bona fides of alleged emotional injuries in intentional-tort cases by letting the factfinder decide whether to accept or to reject such evidence as the injured party may present at trial, rather than allow the accused intentional wrongdoer to prevent such claims at the outset from ever being considered unless there is evidence of bodily injuries. Indeed, in those cases in which the physical symptoms of emotional injuries only appear after the treatment of a "rare and serious condition which required major surgery," intentional tort victims would face a double evidentiary hurdle in proving whatever emotional trauma they may have suffered: not only would they have to establish that physical symptoms exist to recover for their emotional injuries but such symptoms could not even be presented to the factfinder without the support of expert medical-causation testimony. *Compare Marshall v. Tomaselli,* 118 R.I. 190, 196–98, 372 A.2d 1280, 1284–85 (1977) (requiring an expert medical witness in a medical-malpractice case to support the plaintiff's allegation that she was injured as a result of the defendant physician's negligence in performing major surgery on her or in treating her "rare and serious condition" after the operation because (1) the treatment was "neither sufficiently common nor sufficiently nontechnical that a layman could be expected to appraise it" and (2) the attribution of a causal relationship between the plaintiff's injuries and the defendant doctor's alleged negligence "was beyond the ken of an average layman") *with Stuckey v. The Rhode Island Co.,* 42 R.I. 450, 453, 108 A. 581, 583 (1920) (citing with approval cases and authorities distinguishing incompetent medical opinions by lay witnesses from such witnesses testifying to the external appearance of their own injuries as well as to their " 'feelings, pains and symptoms, as well as to all the characteristics of the injury, external and internal' "); *see also* 31A Am.Jur.2d *Expert and Opinion Evidence* §§ 199–210 (1989); Annotation, *Admissibility of opinion evidence as to cause of death, disease, or injury,* 66 A.L.R.2d 1082, 1126–27 (1959).

---

*Action,* 67 Temp. L.Rev. 769, 781 (1994) (observing that the "trend" in these cases "has been to

abandon the requirement that emotional distress develop into physical injury").

Finally, the First Amendment privilege does not preclude plaintiffs' intentional-infliction-of-emotional-distress claim. For all the reasons set forth in the court's opinion concerning why the First Amendment privilege does not preclude plaintiffs' negligence claim (Maj. op. at 11–14), *a fortiori* such a privilege does not bar plaintiffs' intentional-infliction-of-emotional-distress claim. *See Howell v. New York Post, Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). The *Howell* decision says as much:

> "We do not mean to suggest * * * that a plaintiff could never defeat the privilege and state a claim for intentional infliction of emotional distress.
>
> " * * *
>
> "Courts have recognized that news-gathering methods may be tortious * * * and, to the extent that a journalist engages in such atrocious, indecent and utterly despicable conduct as to meet the rigorous requirements of an intentional infliction of emotional distress claim, recovery may be available." *Id.,* 596 N.Y.S.2d at 356, 612 N.E.2d at 705 (citing *Galella v. Onassis,* 487 F.2d 986, 995 (2d Cir.1973)).

The *Galella* court made this point even more emphatically. In rejecting the contention that the First Amendment is a wall of immunity protecting the media from any liability, the court said: "Crimes and torts committed in news gathering are not protected. * * * There is no threat to a free press in requiring its agents to act within the law." *Galella,* 487 F.2d at 995–96.

Moreover, this is hardly a "publication—without more" case. Thus the "privileged conduct" exception cited by the majority should not have been applied so as to prevent these plaintiffs from prosecuting their claim for intentional infliction of emotional distress.

Accordingly, not only would I sustain the plaintiffs' appeal challenging the dismissal of their intentional-infliction-of-emotional-distress claim but I would also remand this aspect of the case, together with the negligence claim, for further proceedings, including, if necessary, a trial.