**368 A.2d 1242.**

LEE WILLIAM POWERS *vs.* JACK CARVALHO.

FEBRUARY 3, 1977.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This is an appeal from a civil action wherein the jury awarded the plaintiff damages for false imprisonment, slander, and assault and battery.[1] The defendant alleges as error certain evidentiary rulings of the trial justice and his denial of the defendant's motions for a directed verdict and a new trial.

These parties have visited our court before. In *Powers v. Carvalho*, 109 R.I. 120, 281 A.2d 298 (1971), we remanded the controversy to the Superior Court for a new trial because the trial justice had allowed evidence that the plaintiff had successfully passed a lie detector test.[2] A brief recounting of the evidence presented at trial is merited. We shall refer to the litigants by their last names.

This drama began on March 26, 1956. Carvalho at that time was 58 years old and owned a retail liquor store in Pawtucket. He testified that at 11:30 a.m. on the day in

---

[1] The verdicts amounted to $1,000 for false imprisonment, $15,000 for slander, and $4,000 for assault and battery. Later, the court ordered a remittitur in the assault and battery verdict to the amount of $2,000. The plaintiff complied with this order.

[2] The first trial concerning this controversy was held in 1969, and the jury returned a verdict in the amount of $3,000 for the false imprisonment, $20,000 for slander, and $2,000 for the assault. Thereafter, Powers sought an additur for the assault, and Carvalho sought a new trial. Subsequently, Powers abandoned his effort to increase the assault award, and the trial justice then ordered new trials in the slander and false imprisonment actions unless Powers remitted all of the slander damages that exceeded the sum of $3,000. Both parties prosecuted appeals to this court.

question, Powers entered his store, struck him over the head with a whiskey bottle, and attempted to open the cash register. A struggle ensued, and Powers fled the scene. When the police arrived, Carvalho gave them a description of his assailant and further identified the would-be robber as a man who some 2 hours earlier had a verbal tiff with a girl on the sidewalk in front of his store. Carvalho also told the police that the intruder lived in a nearby hotel.

A team of detectives went to the hotel and arrested Powers and took him to police headquarters. The total elapsed time between the arrival of the police at the liquor store and his apprehension was a half hour. Later, Carvalho went to the station and made a positive identification of Powers as the wrongdoer, and he further affirmed his conviction by punching Powers in the eye during the course of the police interrogation. Carvalho admitted the assault but claimed he was provoked by Powers' calling him a "Porgee liar." The police chief who was present during the interrogation told the jury that he recalled the punch but not the provocation.

Two witnesses to the flight portion of the attempted robbery were also brought to police headquarters and witnessed a lineup; neither could identify Powers as the assailant. After a further investigation into the incident, the police could find no evidence, besides Carvalho's identification, implicating Powers in the crime. No charges were filed against Powers, and he was released from custody 2 days after his arrest. Three months thereafter he instituted this suit.

In the spring of 1956 Powers was employed as a trainer of thoroughbred horses at Lincoln Downs. At the second trial in December of 1971 he presented corroborated testimony which indicated that on the morning of the attempted robbery he had been at the racetrack. Returning to Pawtucket at about 11:30 a.m., he and two friends went

to his hotel room. The friends decided to go somewhere and get a beer, and as Powers left his room to join them, he was arrested. He testified that as a result of his 2-day incarceration he was unable to regain his job at the racetrack. Since that time to the present Powers has been able to procure only part-time employment.

Powers admitted that at 9 a.m. on the day in question he participated in a verbal argument with a girl in front of Carvalho's establishment. The girl was his wife, Adrienne. Adrienne testified that she and Powers did have a brief encounter outside Carvalho's store concerning the use of their car. Powers won and took the car to the racetrack. In the spring of 1956 Adrienne was 19 and, as Powers told the jury, "a really pretty girl." Her testimony and that of another witness tended to establish that Carvalho had a more than passing interest in Adrienne's welfare and Powers' treatment of her.

Adrienne testified that as she headed back to the hotel after the sidewalk confrontation had ended, she met Carvalho, who told her that she did not have to take that "kind of abuse"; that the hotel was no place for her; and that Powers was "a bad man." She also added that Carvalho informed her that he owned some apartments and that he "could be good to a girl like you." Adrienne also said that the day following the assault incident she returned to Carvalho's store and pleaded with him to think through what had gone on because her husband "couldn't have done this, and didn't do it." According to this witness, Carvalho replied that he was sorry. Adrienne told the jury that whenever she passed by the store, Carvalho would come to the entrance and make "friendly little remarks—kind of flirting." She also said that she had seen Carvalho at the hotel.

Carvalho denied having any extended conversations or meeting with Powers' spouse. He insisted that his only

encounter with Adrienne occurred on the day following the assault, when she entered the store and told Carvalho that her husband was going to sue him. Carvalho, who speaks English with some difficulty, replied: "I don't care. He can do anything if he like him. He's a bad boy."

There was testimony from a friend of Powers that sometime in 1956 Carvalho was at the bar in the hotel where Powers resided and asked the witness if he knew the girl who was on the other side of the room. The witness told the jury that he informed Carvalho that the girl was Powers' wife.

Carvalho first contends that the trial justice erred in denying his motions for directed verdict and new trial on the false imprisonment and slander actions. For the sake of clarity, we shall briefly set out the criteria a reviewing court will follow in determining the appropriateness of the trial court's ruling, and then apply these standards to the individual causes of action.

The standard for determining whether or not a court should grant a directed verdict has been set out, and reaffirmed, by this court in numerous cases. *Economou* v. *Valley Gas Co.*, 112 R.I. 514, 312 A.2d 581 (1973); *Hamrick* v. *Yellow Cab Co.*, 111 R.I. 515, 304 A.2d 666 (1973); *Dawson* v. *Rhode Island Auditorium, Inc.*, 104 R.I. 116, 242 A.2d 407 (1968). In *Hamrick* we noted that the trial justice should review all the evidence in the light most favorable to the party against whom the motion is made without weighing the evidence or considering the credibility of the witnesses and extract from the record only those reasonable inferences that support the position of the party opposing the motion. "If after taking such a view, the trial justice finds that there exist issues upon which reasonable men might draw conflicting conclusions, the motion for a directed verdict should be denied and the issues should be left for the jury to determine. In review-

ing the trial justice's decision we are bound by the same rules." *Hamrick* v. *Yellow Cab Co., supra* at 522, 304 A.2d at 671.

A trial justice, in considering a new trial motion, acts as the thirteenth juror, who must review all the evidence, pass on the credibility of witnesses, weigh the evidence, and draw reasonable inferences therefrom. If, upon an independent appraisal of the record, his experienced judgment tells him that the jury's verdict is contrary to the fair preponderance of the evidence, he must grant the motion for new trial and set aside the verdict. *Barbato* v. *Epstein,* 97 R.I. 191, 196 A.2d 836 (1964). This court will reverse a trial justice's determination only where it finds that the trial justice has misconceived or overlooked material evidence on a critical issue or was otherwise clearly wrong. *Malinowski* v. *Zalzal,* 113 R.I. 90, 317 A.2d 875 (1974); *Gordon* v. *Campanella Corp.,* 112 R.I. 417, 311 A.2d 844 (1973). Moreover, even where the trial justice has erred, the jury's verdict will remain unchanged if this court, upon looking at the record in the light most favorable to the prevailing party, finds any competent evidence which sustains the jury's verdict. *Morinville* v. *Morinville,* 116 R.I. 507, 359 A.2d 48 (1976). With these principles before us, we now proceed to discuss the various facets of Powers' suit.

### False Imprisonment

Carvalho argues at some length and with great vigor that his motion for a directed verdict on Powers' claim for false imprisonment should have been granted because of a complete lack of any evidence which would indicate that his actions in identifying Powers were motivated by malice. Carvalho's reference to "malice" indicates that he is attempting to mix some of the elements of a claim for malicious prosecution with those that constitute a claim for false imprisonment. Such a mixture cannot take be-

cause false imprisonment and malicious prosecution are two distinct torts.

Long ago this court said that false imprisonment is the unlawful detention of another without his consent, and "malice is not an essential element thereof." *Hobbs* v. *Ray,* 18 R.I. 84, 85, 25 A. 694, 694 (1892). The essential element of this tortious act is that the arrest complained of is made without legal process or under a void process, while, on the other hand, malicious prosecution is the institution of legal proceedings whereby an arrest is made under a lawful process and the essential elements of such an action are proof that the party instituting the proceedings which resulted in the arrest had acted with "malice and want of probable cause." *Hobbs* v. *Ray, supra* at 85, 25 A. at 694. In actions based upon a complaint of malicious prosecution, "clear proof" of malice and want of probable cause is required, and the stricter burden is imposed because of the belief that actions for malicious prosecution can deter the prosecution of criminal activity. *Fox* v. *Smith,* 26 R.I. 1, 5, 57 A. 932, 934 (1904). The distinctions between false imprisonment and malicious prosecution have been alluded to and stressed by this court on innumerable occasions.

Carvalho, in insisting upon an absence of malice, directs our attention to certain language found in *Brusco* v. *Morry,* 54 R.I. 108, 170 A. 84 (1934), where this court appears to be saying that the differences between false arrest and malicious prosecution are purely semantical and immaterial. However, a close examination of *Brusco* shows that the court then went on to say that the plaintiff, who had sued in "an action on the case for malicious arrest," had to show that the defendant, whose affidavit had caused the issuance of a civil writ of arrest resulting in the plaintiff's incarceration, had acted "maliciously" and "without having any probable cause" when he executed the affidavit.

While the court in *Brusco* misstated the burden of proof by calling for proof of these elements by the preponderance of the evidence, the court indicated that it was aware that malicious prosecution and false arrest are indeed different torts.[3]

Having had our say as to the distinctions to be drawn between an action which is based on a claim for false imprisonment and another which is based on malicious prosecution, we finally come to the critical question presented by this facet of Carvalho's appeal and that is: When does a private citizen become liable in an action for false imprisonment where the arrest and detention are effectuated by the police because of information supplied by the citizen? In *McGarrahan* v. *Lavers*, 15 R.I. 302, 3 A. 592 (1886), this court ruled that it was "* * * well settled that every private person is responsible for a wrongful imprisonment directed or authorized by him." Later, in *Sylvester* v. *Buerhaus*, 71 R.I. 335, 45 A.2d 150 (1946), it was noted that in a suit based on a claim for false imprisonment, it was not necessary to produce direct evidence to prove that the defendant had "induced or instigated" the arrest. However, at no time have we ever delineated the point at which it could be said that the citizen had "induced or instigated" the arrest.

In denying Carvalho's motion for a directed verdict on

[3]The court in *Brusco* v. *Morry*, 54 R.I. 108, 170 A. 84 (1934), in its allusion to semantics, actually was referring to the fact that the plaintiff had sued for malicious arrest and was comparing malicious arrest with malicious prosecution. A reading of the cases cited in *Brusco* indicates that the distinction drawn in the cases cited is between an action involving malicious prosecution and one based upon an alleged abuse of process. The gist of malicious prosecution is the commencement of an action or the issuance of process without probable cause, while abuse of process concerns itself with the process that is properly issued but used to secure a collateral advantage that was not within the scope of the process such as the return of property or the payment of money. *Manufacturers Supply Co.* v. *Parker*, 103 R.I. 426, 238 A.2d 616 (1968).

that portion of Powers' claim that related to false imprisonment and slander, the trial justice said that there was sufficient evidence to show the existence of malice. Later, when he charged the jury, the trial justice told the jury that a private citizen is liable for a wrongful arrest "authorized or directed by him," and he further instructed the panel that a verdict should be returned for Powers if it believed (1) Carvalho had accused Powers of being the bottle-wielding assailant, (2) this accusation was the "moving cause" for Powers' 48-hour incarceration, and (3) the accusation was made "with malice, without reasonable grounds." Later, when the trial justice instructed the jury on the elements of slander, he alluded to the duty of one who knows that a crime has been committed to assist the police in the discovery of the wrongdoer. "Public policy," he said, "favors prosecution for crime and requires that a person who in good faith and upon reasonable grounds institutes proceedings upon a criminal charge shall be protected," but he emphasized that this privilege does not provide a defense "* * * for the defendant if you, the jury, find that the defendant acted with a malicious motive and recklessness. Recklessness would amount to malice."

Although the *McGarrahan* and *Sylvester* cases might appear to stand for the proposition that those who summon the police and give them information relative to a crime run the risk of being immersed in civil litigation should the police investigation prove fruitless, this court has never addressed itself to the privilege to which the trial justice referred when he charged the jury in the case at bar. Prosser points out that in order to find liability for the instigator of an unlawful arrest, "* * * the defendant must have taken some active part in bringing about the unlawful arrest itself, by some 'affirmative direction, persuasion, request or voluntary participation.' There is no liability for merely giving information to legal authorities, who are

left entirely free to use their own judgment, or for identifying the plaintiff as the person wanted, or requesting a proper arrest when an officer makes an improper one instead, or swearing to a complaint before a magistrate who turns out not to have jurisdiction. The remedy in such cases, if any, is by an action for malicious prosecution." Prosser, *Torts* §11 at 47 (4th ed. 1971).

Several jurisdictions have taken the position that an individual may not be liable for false arrest when in good faith he merely provides mistaken information to the police. *Turner* v. *Mellon,* 41 Cal.2d 45, 257 P.2d 15 (1953); *Shires* v. *Cobb,* 534 P.2d 188 (Ore. 1975); *McCord* v. *Tielsch,* 14 Wash. App. 564, 544 P.2d 56 (1975). On the other hand, it is recognized that if an informer knowingly gives false information to an arresting officer, he becomes liable when such information is the determining factor in the decision to make an arrest. *Newton* v. *Spence,* 20 Md. App. 126, 316 A.2d 837 (1974); *Wehrman* v. *Liberty Petroleum Co.,* 382 S.W.2d 56 (Mo. App. 1964); *Jensen* v. *Barnett,* 178 Neb. 429, 134 N.W.2d 53 (1965); *see also* 1 Harper & James, *Law of Torts* §4.11 at 341 (1956); Annot., 21 A.L.R.2d 639 (1952).

We believe that the rule exonerating the honest informer rests on the sound public policy that in the interests of efficient enforcement of the criminal law a private citizen who seeks to assist the police by supplying honest but mistaken information about crime should be exonerated from liability. Accordingly, we adopt the rule that the good-faith but mistaken informant who simply reports his or her version of the facts to the police or the prosecuting authority is not liable in an action for false arrest, but the individual who knowingly gives false information is liable when such information leads to an arrest.

In seeking to assess Carvalho's motives in identifying Powers as the person who committed the March 1956 as-

sault, there was evidence from which the jury could find that Carvalho was guilty of a deliberate falsehood when he told the police that Powers had assaulted him and attempted to rifle the cash register. However, since the trial justice spoke in terms of malice when he considered the motions for directed verdict and a new trial, Powers did present evidence which, if believed, would warrant the inference that Carvalho's accusation was not a bona fide effort to promote law enforcement, but rather that he instigated the arrest because he was motivated by his feelings for Adrienne and the way Powers supposedly mistreated her. We see no reason for disturbing the denial of either motion.

### Slander

As to the slander verdict, Carvalho argues that the jury could only find malice by pyramiding inference upon inference, relying upon *Waldman* v. *Shipyard Marina, Inc.,* 102 R.I. 366, 230 A.2d 841 (1967). He contends that the pyramid is composed of stones of speculation and consequently that, as a matter of law, there is no competent evidence which would support the jury's verdict.

This court has recognized that a slanderous utterance can be actionable per se where it falsely charges a person with the commission of an offense, which, although not a crime at common law, if proved, while it might not subject the person accused to an ignominious punishment, would bring disgrace upon such an individual. *Laudati* v. *Stea,* 44 R.I. 303, 117 A. 422 (1922); *Kelley* v. *Flaherty,* 16 R.I. 234, 14 A. 876 (1888). Carvalho accused Powers of assaulting him with an intent to rob. The Legislature has declared that anyone who is found guilty of the crime of committing an assault with an intent to rob shall be imprisoned for a term of not less than 1 year and not more than 20 years. General Laws 1956 (1969 Reenactment) §11-5-1. Since the potential punishment for this crime exceeds 1 year, the

crime by our standards is an "infamous" one. *State* v. *Rezendes,* 105 R.I. 483, 253 A.2d 233 (1969). Consequently, we have no hesitancy in holding that Carvalho's charge was slanderous per se. *See Moriarty* v. *Lippe,* 162 Conn. 371, 294 A.2d 326 (1972).

However, even in those instances where the charge is slanderous per se, the accuser may have a qualified privilege to speak out if he reasonably believes that he has a legal or moral duty to do so to protect his own interests. *Ponticelli* v. *Mine Safety Appliance Co.,* 104 R.I. 549, 247 A.2d 303 (1968). Certainly, a victim of crime should be afforded a similar privilege, but the privilege may be lost if the slander is uttered without a reasonable belief as to its truth but with malice. *Id.* at 555, 247 A.2d at 308. Malice, as it relates to a defamatory utterance, has been defined as ill will, spite, malevolence. *Swanson* v. *Speidel Corp.,* 110 R.I. 335, 340, 293 A.2d 307, 310 (1972).

What we have said about the denial of the motion for directed verdict and the motion for new trial on Powers' claim for false arrest applies equally well to the slander. There is ample evidence in the record from which the jury could infer that Carvalho had no reasonable basis whatsoever for the charges he leveled against Powers and his sole motive for doing what he did was the ill will or spite that he felt toward Powers. Accordingly, we affirm the trial justice's denial of the motion for directed verdict and the motion for a new trial.

### Charge to the Jury

The trial justice's charge relating to the privilege afforded the good-faith informer was taken verbatim from one of Carvalho's requests for instructions. While Carvalho has no objections to this specific portion of the charge, he does object to the trial justice's instructing the jury that it could find malice if it believed that Carvalho in his deal-

ing with the Pawtucket police had acted recklessly. He objects to the trial justice's equating recklessness with malice because he says there is no evidence that he acted in a reckless manner. We do not agree.

The issue presented to the jury was in fact quite simple. Someone assaulted Carvalho and attempted to rob him. Carvalho insisted that Powers was the would-be robber. The police fingerprinted Powers and had in their possession the portion of the whiskey bottle that had been used as the weapon. Powers' clothing was taken from him by the police and sent to a laboratory for a microscopic examination of the garments for blood or glass particles. Pawtucket's Police Chief testified that the only evidence which caused his department to continue Powers' confinement was Carvalho's insistence that Powers was the one involved in the assault episode. The evidence adduced by Powers showed that he couldn't have been at the liquor store at the time of the assault and that the only reason for the unfounded accusation was Carvalho's interest in Adrienne's future welfare. We see no reason to fault the charge that was given because when the trial justice spoke of recklessness, he was merely reminding the jury that malice may have nothing to do with ill will in the conventional sense, but malice which would destroy the privilege can be established by a showing that the statement was made with the knowledge that it was false or with a reckless disregard of whether it was false or not. The charge as given was merited because there was evidence which, if believed, would support a belief that Carvalho, because of his insistent attitude, was neither interested in furthering the ends of justice nor in the dire consequences an unfounded charge might have upon Powers' present or future well being.

### Evidentiary Rulings

Carvalho attempted to introduce into evidence six divorce petitions, each of which was filed by Adrienne against Powers at various times during the period beginning in 1954 and ending in 1961. Each petition sought a divorce on the grounds of extreme cruelty and failure to support as well as alimony for Adrienne and support for the couple's two minor children. Carvalho also sought to introduce into the record a final decree, which indicates that the Powerses were divorced in October 1965. The trial justice refused to allow these exhibits to become part of the record and excluded any questioning along those lines. Carvalho claims that the exclusions amount to reversible error.

Assuming that the trial justice erred in excluding this evidence, there is a certain benchmark which must be employed to determine if the error pertaining to these rulings was sufficient to warrant reversal. Carvalho must convince us that these documents were relevant and material to a crucial issue and that it is reasonable to say that this evidence, if admitted, would have had a probable influence on the jury verdict or a controlling influence on a material aspect of the case. *Mercurio* v. *Fascitelli,* 116 R.I. 237, 354 A.2d 736 (1976); *Urbani* v. *Razza,* 103 R.I. 445, 238 A.2d 383 (1968). Carvalho claims that he was foreclosed from showing that all was not love and kisses at the Powers residence. The record indicates that the jury could have been well aware that, as far as the state of matrimonial bliss at the Powers domicile was concerned, the occupants had their good and bad days. Evidence was introduced that Adrienne had filed an assault and battery complaint against her husband. She also testified that she would hit him now and again. One of the hits was made at a time when she had a flatiron in her hand.

We think little of Carvalho's theory that the excluded

evidence would tend to show the jury that Adrienne had a pecuniary interest in the outcome of the trial. The final decree left the question of alimony open and called for the weekly payment of $30 for support of the two minor children. When the parties appeared for the second trial in December 1971, this case had been a statistic in the Superior Court's file of pending cases for over 15 years. Carvalho was then over 70 and Adrienne was no longer 19. She had remarried, and someone other than Powers had a duty to support her. In addition, there was no offer of proof that Powers was delinquent in his support payments. Opening the door to such a collateral issue as Adrienne's possible pecuniary interest in appearing on behalf of her first husband could lead the litigants and the jury into a number of subsidiary issues. The excluded evidence presented a problem which was directed to the sound discretion of the trial justice. We have scrutinized the excluded evidence against the record presented at trial, and it is our firm belief that, if admitted, this evidence would not have had the impact on the jury that Carvalho claims that it would.

The defendant's appeal is denied and dismissed.

Mr. Justice Paolino did not participate.

*John F. McBurney,* for plaintiff.

*Blais, Cunningham, Thayer, Gagnon & Ross, Ronald R. Gagnon,* for defendant.