Donald C. HILL

v.

**RHODE ISLAND STATE EMPLOY-
EES' RETIREMENT BOARD
et al.**

No. 2006–225–Appeal.

Supreme Court of Rhode Island.

Nov. 16, 2007.

**610**

---

Walter Stone, Providence, for petitioner.

Michael Field, Esq., for respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on September 25, 2007, on appeal by the plaintiff, Donald C. Hill (plaintiff or Hill), from two summary judgments entered in favor of the defendants, Rhode Island State Employees' Retirement Board (Retirement Board) and Nancy Mayer (Mayer), in her capacity as former General Treasurer of the State of Rhode Island (hereinafter referred to collectively as state or defendants). For the reasons stated in this opinion, we affirm the summary judgments entered by the Superior Court.

## Facts and Travel

The plaintiff filed suit against the state on January 24, 2001, and alleged negligence, intentional infliction of emotional distress, and malicious prosecution arising from a criminal prosecution based on events that occurred in 1990, when plaintiff, as executive director of the National Education Association of Rhode Island (NEARI), wrote a letter to the Retirement Board about the employment status of Ronald DiOrio (DiOrio). DiOrio had been president of NEARI from approximately 1971 until 1985, when he became director of policy for Governor Edward DiPrete. The events leading up to this prosecution are as follows.

In 1987, the General Assembly enacted legislation that allowed full-time union employees who represented state and municipal workers to participate in the state retirement system, notwithstanding that these employees did not work for the state or its subdivisions (the 1987 Act).[1] The 1987 Act provided that, to be eligible to join the system, the union must forward a

---

1. Public Laws 1987, ch. 613, § 1(b), later codified in G.L.1956 § 36–9–33, provided in relevant part as follows:

"Any member of the state employees retirement system or any full-time employee of an organization representing employees of the state and/or any political subdivision thereof for the purposes of collective bargaining, who has prior hereto been a full-time employee of such an organization or who has been employed by any public school district in-state or out-of-state, may purchase credit for such employment."

certified vote of acceptance by the union's governing authority to the Retirement Board. Thereupon, all current employees would become members of the retirement system; significantly for this case, any employee on an "official leave of absence" from his or her job with the union was eligible to purchase retirement credits for the period during which he or she was on an "official leave of absence." On December 8, 1987, while DiOrio was still working for Governor DiPrete, NEARI adopted a resolution electing to join the retirement system. On June 9, 1988, the General Assembly repealed the 1987 legislation in its entirety. P.L. 1988, ch. 486.

Within months of the 1988 repeal, DiOrio returned to NEARI, but the nature and duration of this relationship was subject to dispute. Notwithstanding, in February 1989, DiOrio founded a consulting firm, Strategy Corporation. He vacated the NEARI office building, purchased his own office equipment and furniture, hired staff, and was paid a retainer by NEARI. The union did not issue DiOrio an IRS Form W–2, the hallmark of a wage-earning employee. Rather, he received an IRS Form 1099, signifying compensation as an independent contractor. *See, e.g., Mazzei v. Rock–N–Around Trucking, Inc.,* 246 F.3d 956, 964 (7th Cir.2001).

Meanwhile, during its 1990 session, the General Assembly enacted legislation providing for early retirement benefits for members of the retirement system, including union representatives. P.L. 1990, ch. 65, art. 80, § 1.[2] This legislation allowed an "active" employee to receive pension benefits as long as the employee separated from service during a one-month window, between June 30, 1990 and July 28, 1990. *Id.* § 2. To qualify for a taxpayer-financed pension, DiOrio had to establish that he was an employee of NEARI, who in accordance with the 1987 Act, had been on an "official leave of absence" and then resigned from the union.

On July 23, 1990, DiOrio applied to the retirement system for an early retirement. Days before his purported resignation, DiOrio obtained a letter from NEARI President Harvey Press to Donald Hickey, the executive director of the Employees' Retirement System, verifying that he had been employed at NEARI from September 1, 1973 to October 1, 1985. Additionally, on July 26, 1990, DiOrio obtained a letter from Hill to the Retirement Board that declared:

> "This is to certify that Ronald L. DiOrio, Social Security [number deleted] returned to our payroll at the National Education Association Rhode Island in October 1988 at an annualized rate of pay of $50,000. He took an unpaid leave of absence to start his consulting firm in February 1989. Mr. DiOrio has resigned his leave effective July 27, 1990."

DiOrio then submitted a resignation from his purported employment with NEARI on July 27, 1990.

On August 1, 1990, James Reilly, acting director of the Employees' Retirement System, advised DiOrio that to become pension eligible, he could purchase retirement credits. DiOrio did so and collected a state pension until an investigation re-

---

**2.** Public Laws 1990, ch. 65, art. 80, § 1 provided:

"[a]n active employee in the state retirement system \* \* \* who has attained the age of sixty (60) or fifty-eight (58) for a municipal employee and completed at least ten (10) years of total service, or who, regardless of age, has completed twenty-three (23) or more years of total service, may, during the period as specified in section 2, retire \* \* \*."

Section 2 provided that "[t]he period when state employees may retire shall be from June 30, 1990 to July 28, 1990."

vealed that he was not entitled to participate in the retirement system.

In 1993, at Mayer's direction, the General Treasurer's Office began to review pensions for union employees and wrote to Hill requesting employment contracts, IRS Forms W–2, and any union documentation relative to leaves of absence for ten people, including DiOrio. In response, the union produced nine IRS Forms W–2 and one IRS Form 1099, which was for DiOrio. That IRS Form 1099 indicated that DiOrio had received non-employee compensation.

On February 17, 1994, Joann E. Flaminio, the executive director of the Employees' Retirement System, notified DiOrio that her records indicated that he was ineligible to receive retirement benefits because he was not a union employee at the time NEARI voted to adopt the provisions of the 1987 Act. He was given an opportunity to submit evidence of his employment, but he failed to do so. However, DiOrio continued to collect his pension until the General Assembly enacted the Eviction Act in 1994, P.L. 1994, ch. 413, § 1, which meant that people who became members of the retirement system based on the 1987 Act were no longer entitled to membership and could not receive any benefits. See G.L.1956 §§ 36–9.1–1 and 36–9.1–2.

At the behest of the General Treasurer's Office, the Rhode Island State Police began investigating alleged abuse of the pension system, including the circumstances surrounding DiOrio's pension and Hill's letter to the Retirement Board. The veracity of Hill's letter, and in particular whether DiOrio was a NEARI employee who was on an "official leave of absence" in accordance with the 1987 Act, was the focus of a grand jury investigation. An indictment was returned against DiOrio and Hill, charging DiOrio with obtaining money under false pretenses, conspiring with Hill to obtain money under false pre-

tenses, and filing a false document. Hill was charged with conspiring to obtain money under false pretenses and aiding and abetting DiOrio in obtaining money under false pretenses.

In a jury-waived criminal trial, DiOrio was acquitted of all charges. Thereafter, on July 26, 1999, the two counts against Hill were dismissed by the state.

The plaintiff filed this action on January 24, 2001, alleging: (1) negligence, (2) intentional infliction of emotional distress, and (3) malicious prosecution. On November 18, 2003, a justice of the Superior Court granted defendants' motion for summary judgment on the malicious-prosecution allegation. The defendants then sought summary judgment with respect to the remaining counts, based upon the statute of limitations. This motion was heard and granted on May 16, 2006, and plaintiff filed a timely notice of appeal to this Court.

## Standard of Review

"In passing on a grant of summary judgment by a justice of the Superior Court, this court conducts a *de novo* review." *United Lending Corp. v. City of Providence,* 827 A.2d 626, 631 (R.I.2003). Summary judgment is proper if there are no genuine issues of material fact evident from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" and the motion justice finds that the moving party is entitled to judgment as a matter of law. *Lavoie v. North East Knitting, Inc.,* 918 A.2d 225, 227–28 (R.I.2007) (quoting Super. R. Civ. P. 56(c)). In conducting *de novo* review, our task is to "determine whether the admissible evidence viewed in a light most favorable to the nonmoving party reveals a genuine issue of material fact." *Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.,* 890 A.2d 58, 62 (R.I.2005) (citing *Carlson v. Town of*

*Smithfield,* 723 A.2d 1129, 1131 (R.I.1999)). "The party opposing the motion for summary judgment 'carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.'" *Taylor v. Mass. Flora Realty, Inc.,* 840 A.2d 1126, 1129 (R.I.2004) (quoting *United Lending Corp.,* 827 A.2d at 631).

### Malicious–Prosecution Claim

The plaintiff assigns error to the grant of summary judgment with respect to the malicious-prosecution count.[3] In his decision, the motion justice found that plaintiff failed to produce any evidence that would overcome the principle that a grand jury indictment serves as *prima facie* evidence of probable cause to initiate the prosecution. It is plaintiff's contention that the motion justice erred in this finding.

■■■ Rhode Island long has recognized the tort of malicious prosecution. *Solitro v. Moffatt,* 523 A.2d 858, 861 (R.I. 1987). To recover damages for malicious prosecution, a party must "prove that (1) defendants initiated a prior criminal proceeding against him, (2) they did not have probable cause to initiate such a proceeding, (3) the proceeding was instituted maliciously, and (4) it terminated in [plaintiff's] favor." *Id.* at 861–62 (citing *Nagy v. McBurney,* 120 R.I. 925, 392 A.2d 365 (1978)). Historically, actions for malicious prosecution have been disfavored because such claims may tend to deter prosecution of criminal offenses. *Solitro,* 523 A.2d at 862 (citing *Powers v. Carvalho,* 117 R.I. 519, 368 A.2d 1242 (1977)). For this rea-

son, the plaintiff must establish "clear proof" of malice and lack of probable cause. *Soares v. Ann & Hope of Rhode Island, Inc.,* 637 A.2d 339, 345 (R.I.1994) (citing *Solitro,* 523 A.2d at 862).

■■■ Whether defendants in a malicious-prosecution action had probable cause to initiate a criminal action is a question of law to be determined by the court. *Solitro,* 523 A.2d at 862 (citing Prosser & Keeton, *The Law of Torts* § 119 at 882 (5th ed. 1984); Restatement (Second) *Torts* § 673, comment (e) at 450 (1977)). The facts that support the criminal charge at issue need not convince a prudent person that guilt exists beyond a reasonable doubt, but it is sufficient if the facts known to the accuser provide reasonable grounds for a belief that the accused has engaged in criminal activity. *Solitro,* 523 A.2d at 862 (citing *Johnson v. Palange,* 122 R.I. 361, 372, 406 A.2d 360, 366 (1979)).

■■■ This Court previously has examined the role of a grand jury indictment in a subsequent allegation of malicious prosecution. *See Giusti v. Del Papa,* 19 R.I. 338, 33 A. 525 (1896) (dismissing the malicious-prosecution allegation, when the defendant caused the plaintiff to be arrested, bound over by the district court to await the action of the grand jury, and indicted by the grand jury). The *Giusti* Court declared that when the plaintiff was bound over by a court and indicted by the grand jury, satisfactory evidence of probable cause was established. *Id.* at 340, 33 A. at 526. We have not departed from this holding. To rebut a presumption of probable cause arising from a grand jury indictment, the plaintiff must allege some addi-

---

**3.** This allegation was dismissed on its merits rather than on statute of limitations grounds because the malicious-prosecution allegation did not start to run until the criminal case was dismissed on July 26, 1999. We have

determined "that a cause of action for malicious prosecution accrues on the date of entry of judgment in the action claimed to have been malicious." *Salvadore v. Major Electric & Supply, Inc.,* 469 A.2d 353, 357 (R.I.1983).

tional fact showing fraud, perjury, or other undue means. *Id.* An allegation that there is a lack of probable cause, standing alone, is not a statement of fact, but only a conclusion of law. *Id.* at 341, 33 A. at 526; *see also Cook v. Lester,* 99 R.I. 28, 30–31, 205 A.2d 143, 144–45 (1964). If the allegation is unsupported by clear proof of malice, then it is refuted by the fact that the plaintiff actually was indicted by a grand jury.

 In the case before us, a felony indictment was returned by a grand jury; this is *prima facie* evidence of probable cause for purposes of initiating the prosecution. This evidence could be rebutted by clear proof that the indictment was procured through fraud, perjury, or other undue means, as set forth herein. That is, "with evidence that the [indictment] was procured by fraud, perjury, misrepresentation, or falsification of evidence." *Solitro,* 523 A.2d at 863.

 On appeal, Hill argues that Mayer's testimony before the grand jury was "false and misleading." However, this allegation was not raised in the Superior Court, nor is there any factual support for this allegation. When faced with a motion for summary judgment, Hill had the burden to produce evidence of fraud, perjury, or other undue means by which the indictment was procured. *See Bourg v. Bristol Boat Co.,* 705 A.2d 969, 971 (R.I.1998) (determining that a party opposing a motion for summary judgment has an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact). He failed to do so. In fact, when asked by the motion justice at the hearing on November 18, 2003, whether there was any proof of fraud, perjury, or falsification of evidence, Hill's counsel responded, "No, Your Honor, not at this juncture." Moreover, Hill's counsel was afforded another opportunity during the trial to show perju-

ry or fraud and did not. Based on this Court's long-standing rule that we will not consider on appeal an issue that was not raised before the motion justice, we deem this issue waived. *State v. Texter,* 896 A.2d 40, 43 (R.I.2006).

The plaintiff points to a colloquy between a grand juror and Mayer as support for his contention that the indictment was fraudulently obtained. He contends that Mayer made false and misleading statements to the grand jury about Hill's letter to the Retirement Board. Further, plaintiff asserts that reasonable minds could differ about the adequacy of the investigation Mayer undertook "before turning Mr. Hill over to the authorities." We carefully have reviewed the record and are of the opinion that these allegations are without merit.

We note at the outset that Mayer did not "turn[ ] Mr. Hill over to the authorities." As an elected official who encountered what appeared to be fraudulent conduct, Mayer referred the evidence to members of the state police for their investigation. It was the state police investigation that resulted in the indictment in this case; Mayer's role was indirect. Moreover, this case did not turn on the timing of DiOrio's employment with NEARI, but rather, on the issue of whether DiOrio was an employee on an "official leave of absence" or a consultant during the relevant period. If DiOrio was a consultant, he was ineligible to receive pension benefits.

 The plaintiff also argues that there was no testimony before the grand jury indicating that the Retirement Board relied on his letter in determining that DiOrio qualified for a pension. As the motion justice pointed out, however, the grand jury was satisfied that sufficient probable cause existed, suggesting that

Hill and DiOrio conspired together to commit the charged offenses. This Court consistently has declined to invade the province of the grand jury in its evaluation of the evidence presented by the state. *See State v. Stone,* 924 A.2d 773, 782 (R.I. 2007). It is well settled that a trial in which the accused enjoys the full panoply of constitutional protections renders harmless any defect within the grand jury process. *State v. Mainelli,* 543 A.2d 1311, 1313 (R.I.1988) (citing *United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986); *State v. Wilshire,* 509 A.2d 444, 448 (R.I.1986); *State v. Manocchio,* 497 A.2d 1, 12 (R.I.1985); *see also State v. Heredia,* 493 A.2d 831 (R.I.1985)). We have declared that "absent 'flagrant and overbearing' misconduct by a prosecutor, the proper remedy for alleged grand jury error is a trial on the merits." *State v. Smith,* 662 A.2d 1171, 1174 (R.I.1995) (quoting *State v. Chiellini,* 557 A.2d 1195, 1199 (R.I.1989), *overruled on other grounds, State v. Werner,* 615 A.2d 1010, 1012–14 (R.I.1992)).

 It is the function of a grand jury to evaluate the evidence presented and the law as set forth by the prosecution and decide whether there is probable cause to believe that the charges are true and that the accused should stand trial. *State v. Romano,* 456 A.2d 746, 754 (R.I. 1983) (citing *Bracy v. United States,* 435 U.S. 1301, 1303, 98 S.Ct. 1171, 55 L.Ed.2d 489 (1978) (Rehnquist, Circuit Justice)). "It is well established that a 'grand jury may decide whether the quality of the evidence presented to it is sufficient to warrant the return of an indictment' " unhindered by the rules of evidence. *Stone,* 924 A.2d at 782 (quoting *State v. Miller,* 679 A.2d 867, 870 (R.I.1996)).

This Court has adhered to the reasoning of *Costello v. United States,* 350 U.S. 359, 363–64, 76 S.Ct. 406, 100 L.Ed. 397 (1956),

in which the United States Supreme Court refused "to establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence." *Stone,* 924 A.2d at 782 (quoting *State v. Franco,* 750 A.2d 415, 419 (R.I.2000)). In the case before us, the grand jury found that probable cause existed for an indictment against Hill, and we again decline to intrude upon the grand jury's prerogatives.

Lastly, plaintiff suggests that if reasonable minds could differ about whether probable cause existed to return an indictment, then defendants were not entitled to summary judgment and the case should have proceeded to trial. To support his argument, Hill points to *Rezendes v. Beaudette,* 797 A.2d 474, 479 (R.I.2002), in which this Court held that there was sufficient evidence to submit the malicious-prosecution claim to the jury because "a reasonable person could have differed on whether defendants had probable cause to file a complaint against plaintiff." That case is of no assistance to plaintiff because there, unlike here, the question of probable cause was not presented to a grand jury.

Not only are we confronted with a grand jury indictment against Hill, which is *prima facie* evidence of probable cause, but also Hill acknowledged before the motion justice that he had no proof of fraud or malice to support the allegation of malicious prosecution. We have held that "[t]he existence of probable cause can sometimes be determined as a matter of law; and therefore, in appropriate situations, that issue can properly be the subject of a motion for summary judgment." *Henshaw v. Doherty,* 881 A.2d 909, 917 (R.I.2005) (citing *Estate of Smith v. Marasco,* 318 F.3d 497, 514 (3d Cir.2003)). In *Henshaw,* 881 A.2d at 917, the Court determined as a matter of law that probable cause existed to initiate a prosecution

based on probable cause that existed when the magistrate issued the arrest warrant. In both the present case and *Henshaw,* an impartial tribunal made a finding of probable cause and plaintiff failed to produce any countervailing proof of fraud, perjury, or other undue means. In the context of this case, the grand jury indictment against Hill, therefore, constitutes *prima facie* evidence of probable cause.

Accordingly, even when viewed in the light most favorable to the plaintiff, there is no proof that overcomes the *prima facie* evidence of probable cause arising from a grand jury indictment. The record discloses that sufficient facts were produced to demonstrate reasonable grounds to believe that DiOrio and Hill conspired together and submitted false and misleading documentation to the Retirement Board. A grand jury reviewed this evidence and returned an indictment against both men. We are of the opinion that summary judgment on the malicious-prosecution count was appropriate.

### Statute of Limitations

The plaintiff argues that the motion justice erred in entering summary judgment for defendants on the counts of negligence and intentional infliction of emotional distress based upon the statute of limitations. The plaintiff alleges that the severe level of stress caused by the criminal indictment in May 1995 did not manifest itself until his heart attack on June 27, 1998. Hill also contends that he was unaware of the state's wrongdoing until the charges against him were voluntarily dismissed on July 26, 1999. The plaintiff asserts that the discovery rule should be applied in this case and that the statute of limitations should not begin to run until 1998 or 1999.

Under Rhode Island law, "[a]ctions for injuries to the person shall be commenced and sued within three (3) years next after the cause of action shall accrue, and not after." G.L.1956 § 9–1–14(b). Typically, "a cause of action accrues and the applicable statute of limitations begins to run at the time of the injury to the aggrieved party." *DeSantis v. Prelle,* 891 A.2d 873, 878 (R.I.2006) (quoting *Rivers v. American Commerce Insurance Co.,* 836 A.2d 200, 204 (R.I. 2003)). Nevertheless, this Court has adopted the discovery rule in certain limited contexts. For instance, in *Wilkinson v. Harrington,* 104 R.I. 224, 243 A.2d 745 (1968), the Court determined that the statute of limitations in medical malpractice actions "does not commence until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered, that he has sustained an injury as a result of the physician's negligent treatment." *Id.* at 234, 243 A.2d at 751; *see also O'Sullivan v. Rhode Island Hospital,* 874 A.2d 179, 188 (R.I.2005) (ruling that "the plaintiff is not obliged to beat the bushes at the first conceivable opportunity" to locate all possible tortfeasors; therefore, the wrongful death statute did not begin to run until at least such time as the decedent's representative received the medical records from the second hospital, a second tortfeasor).

Moreover, this Court has determined that "in a drug product-liability action where the manifestation of an injury, the cause of that injury, and the person's knowledge of the wrongdoing by the manufacturer occur at different points in time," the statute of limitations does not begin to run until "the person discovers, or with reasonable diligence should have discovered, the wrongful conduct of the manufacturer." *Anthony v. Abbott Laboratories,* 490 A.2d 43, 46 (R.I.1985); *see also Zuccolo v. Blazar,* 694 A.2d 717 (R.I.1997) (applying the analysis found in *Anthony* to a

medical malpractice claim regarding the side effects of a prescription drug).

However, this Court has recognized that tolling a statute of limitations based upon the discovery rule should occur only in certain narrowly defined factual situations. *Kougasian v. Davol, Inc.*, 687 A.2d 459, 460 (R.I.1997) (mem.). We never have held, nor do we do so today, that the discovery rule applies to tort claims such as the one presented by plaintiff. Even if we were to do so, we are convinced that plaintiff discovered or should have discovered that he suffered actionable injuries as early as 1995.

▆▆▆ Although Hill argues on appeal that physical manifestation of injury did not arise until his heart attack on June 27, 1998, his complaint and affidavit belie this contention and indicate the existence of actionable injuries as far back as the indictment in May 1995. It is not the degree of suffering that is controlling, but rather when the actionable injury arose. In his complaint, Hill alleged that he was forced to resign his job as executive director of NEARI because of his indictment. In an affidavit, he declared that "[f]rom the time I was indicted on May 17, 1995, until the charges against me were voluntarily dismissed, I suffered great financial, professional, emotional and physical hardships." Hill also asserted by affidavit that "[b]ecause of the criminal charges against me I was forced to discontinue my fundraising and organizing activities on behalf of the National Education Association and American's [*sic*] Child and had to renounce any and all political aspirations."

Additionally, Hill alleged in his affidavit that he was "directed to maintain a residence in Rhode Island" while awaiting trial and that "[d]ue to the stress of the pending criminal charges and the associated humiliation, I suffered from serious depression for which I received counseling for two years between the indictment and the trial." He alleged that "[a]t the time of the indictment, I also developed acid reflux that resulted in the permanent scarring of tissue in my esophagus. I have been on medication to control the heartburn and acid reflux since the indictment."

Even viewed in the light most favorable to plaintiff, the record establishes that Hill knew or, in the exercise of reasonable diligence, should have known, that he had suffered an injury, allegedly arising from defendants' negligent or intentional conduct, in 1995—or at the latest in 1997. Accordingly, when he filed his lawsuit in 2001, his allegations were time-barred.

▆▆▆ Alternatively, Hill argues that the statute of limitations did not accrue until 1999, when the criminal charges against him voluntarily were dismissed. The plaintiff contends that he could not establish wrongdoing by defendants until the charges against him were dismissed. He argues that the grand jury indictment acted as a "veil of validity" that was protecting defendants until the charges were dismissed. We reject this argument. The plaintiff acknowledged that he had access to the transcripts of the grand jury proceedings before 1998. Thus, he could have identified the actors and the actions that led to his indictment more than three years before filing his complaint.

Although an investigation into the cause of an injury may be a long process, it ordinarily does not toll the statute of limitations because such an interpretation would render the statute of limitations meaningless and ineffective. *See Benner v. J.H. Lynch & Sons, Inc.*, 641 A.2d 332, 336 (R.I.1994) (discussing accrual of cause of action for automobile accident). Additionally, this Court has decided in a legal malpractice case that the cause of action

**618**

accrues when the allegedly negligent omission by the attorney should have been discovered in the exercise of reasonable diligence, rather than when the court rendered the adverse decision that injured the client. *Penn–Dutch Kitchens, Inc. v. Grady,* 651 A.2d 731, 733–34 (R.I.1994).

Our holding today is consistent with a very recent decision of the United States Supreme Court in *Wallace v. Kato,* —— U.S. ——, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007), in which the Supreme Court declared that the statute of limitations in a lawsuit seeking damages pursuant to 42 U.S.C. § 1983, arising from an alleged unlawful arrest, began to run when the legal process was initiated against the plaintiff. *Wallace,* 127 S.Ct. at 1096–97 (holding that the statute of limitations began to run when the plaintiff appeared before the examining magistrate and was bound over for trial). We are of the opinion that the statute of limitations on the allegations before us had expired before Hill filed his lawsuit.

### Conclusion

Accordingly, we are satisfied that summary judgment on the allegation of malicious prosecution was properly granted, and we affirm the judgment. We hold that the plaintiff's cause of action on the remaining allegations accrued more than three years before he filed the complaint in this case and that summary judgment on the allegations of negligence and intentional infliction of emotional distress was correct. For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to the Superior Court.